**UNITED STATES of America**

v.

**Charles SHARK**

No. CRIM.92–0405–05(JGP),
No. CIV.A.97–0920(JGP).

United States District Court,
District of Columbia.

July 31, 2001.

Michele A. Roberts, Washington, DC, Jonathan Seth Zucker, Washington, DC, Cheryl Denise Stein, Washington, DC, Anthony Douglas Martin, Greenbelt, MD, for Defendant.

Mary Ann Snow, Kenneth Clair Kohl, U.S. Atty's Office, WAshington, DC, for U.S.

## MEMORANDUM

JOHN GARRETT PENN, District Judge.

Currently pending before the Court is **defendant's Motion to Vacate, Set Aside or Correct the Sentence pursuant to 28 U.S.C. § 2255 [# 353]**. For the reasons contained in this memorandum, defendant's 2255 motion is granted in part and denied in part.

## BACKGROUND

Charles Shark ("Shark") was charged and convicted by a jury of conspiracy to distribute cocaine base, in violation of 21 U.S.C. § 846 (1988 and Supp. V 1993); unlawful distribution of cocaine base, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B)(iii) (1988 and Supp. V 1993); and

criminal forfeiture, in violation of 21 U.S.C. § 853(a)(1) (1988). The trial was conducted by the Hon. Charles R. Richey.

On October 29, 1993, Shark was sentenced by the Hon. Stanley Sporkin. Judge Sporkin, adopting the sentencing recommendations of the probation office, applied the career offender provisions of the United States Sentencing Guidelines and sentenced Shark to 360 months on the conspiracy and distribution counts, to be served concurrently. As for the criminal forfeiture count, Judge Sporkin ordered forfeiture in the amount of $117,600.00. Judge Sporkin also ordered Shark to serve a term of five (5) years supervised release and to pay a special assessment of $100.

A timely notice of appeal was filed on November 8, 1993. On April 18, 1995, the defendant's conviction was affirmed on appeal in *United States v. Shark*, 311 U.S.App.D.C. 182, 51 F.3d 1072, *cert. den.*, *Shark v. United States*, 516 U.S. 955, 116 S.Ct. 405, 133 L.Ed.2d 324 (1995).

On January 21, 1994, defendant filed a motion for a new trial based on newly discovered evidence. That motion was denied by Judge Richey on April 12, 1994. Upon Judge Richey's death, this matter was referred to this Court.

On April 28, 1997, defendant filed a motion for a new trial pursuant to 28 U.S.C. § 2255 [# 353]. The government filed a motion to dismiss for untimeliness, which was denied by this Court on July 8, 1997.[1] Shark filed a supplement to his 2255 mo-

---

1. In its memorandum and order of July 8, 1997, the Court ruled that the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which established a one year limitation on 2255 motions, was not a time bar to Shark's 2255 motion. Under AEDPA, and relevant case law, the last day for Shark to file his 2255 motion was April 23, 1997. Although Shark's 2255 motion was not filed with the Court until April 28, 1997, the Court held that the motion was timely under the prisoner mailbox rule of *Houston v. Lack*, 487

U.S. 266, 108 S.Ct. 2379, 101 L.Ed.2d 245 (1988). Shark claimed he gave his motion to prison officials on April 22, 1997, which was supported "by a copy of a Certificate of Receipt indicating that his document was postmarked by a prison official on April 23, 1997." Memorandum of the Court (filed July 8, 1997)[# 362] at 2. As such, Shark's 2255 motion, as well as all supplements to the motion filed pursuant to the briefing schedule agreed to by the parties, are timely.

tion on December 5, 1997 [# 366]. The government responded to the 2255 motion on January 15, 1998 [# 368]. Shark filed a reply on April 30, 1998 [# 373]. The Court granted Shark additional time to file a "traverse reply," [2] which he filed on July 30, 1999 [# 387].

Shark's current attorney entered an appearance on December 1, 1998 [# 384]. At some point Shark's new counsel indicated that he wished to file supplemental material to the various papers that had already been filed regarding Shark's 2255 motion. At a status hearing on July 26, 2000, the parties agreed to establish a new briefing schedule. The Court required Shark's supplemental memorandum be drafted so that it addressed all of the grounds for relief Shark wished to raise. The Court ruled that the government would only be required to respond to arguments raised in the supplemental brief. *See* Order of the Court (filed July 27, 2000)[# 403]. At the status hearing, the Court explicitly admonished Shark's counsel that the Court would also only consider the arguments raised in the supplemental brief.

Shark filed his supplemental memorandum on November 9, 2000 [# 408]. After several amendments to the briefing schedule, the government filed its response to the supplemental memorandum on January 22, 2001 [# 417]. Shark filed his reply on February 19, 2001 [# 422]. An evidentiary hearing on the supplemental 2255 motion was held on June 4 and 5, 2001.

The Court also notes that, in response to issues raised by Shark in his 2255 motion, the probation office filed a memorandum on November 2, 1999, which revised the original presentence investigation report ("PSR") and proposed a recalculated sen-

tence. Shark filed a response to the probation office's memorandum on January 21, 2000 [# 392].

### DISCUSSION

Shark's 2255 motion is based on six separate grounds. The Court will first address the four grounds which pertain to the conduct of the trial and appeal. The Court will then address the two remaining grounds which pertain to the sentence.

### I. Grounds pertaining to the conduct of the trial and appeal

#### A.

■ Shark's first challenge to his conviction is that Judge Richey violated his Fifth Amendment right to a fair trial by creating a conflict of interest for his trial counsel. During the trial, Judge Richey and Shark's trial counsel, Michelle Roberts ("Roberts"), had a contentious exchange with regards to Shark's motion to suppress audiotape transcripts offered by the government. During a sidebar conference, Judge Richey expressed his annoyance at how late the motion to suppress was made. Judge Richey stated, on the record, that he had specifically warned Roberts's law partner, Mark Rochon ("Rochon"), about making a timely motion to suppress, that he believed Rochon had a track record of always asking for continuances, and that he considered Roberts's objection untimely. Furthermore, Judge Richey said that he had specifically lectured Rochon, that Rochon never paid attention to the Court, and that "next time I'm going to get his attention and put him in the cell block." Mot. at 25.[3]

Shark alleges that after this exchange, Roberts withdrew the motion to avoid con-

---

**2.** When referring to "traverse reply," the Court uses the language of the defendant, who filed the pleading on his own behalf.

**3.** All references to "Mot." refer to the supplemental 2255 memorandum filed on November 9, 2000 [# 408].

flict with the court. Shark charges that "Judge Richey's actions clearly dampened the ardor and resolve of trial defense counsel when he threatened her on the record." Mot. at 4. Shark cites *Tejeda v. Dubois*, 142 F.3d 18 (1st Cir.1998), as support for the proposition that hostility between defense counsel and the trial judge is grounds to vacate a conviction.

This matter has already been decided by the D.C. Circuit on direct appeal. *See Shark*, 311 U.S.App.D.C. 182, 186, 51 F.3d 1072, 1076. As an automatic presumption of prejudice attaches in cases of conflicts of interest, the court held that Shark's constitutional claim regarding Judge Richey's conduct was ingenious, since it allowed him to avoid the stricter standard for establishing ineffective assistance of counsel. The court rejected this approach, doubting that "mere fear of rebuke from the court could ever give rise to a conflict of interest sufficient to establish a predicate for ineffective assistance." *Id.* Otherwise, "any provocation of the court, even on the smallest matter, could be maneuvered into an excuse for invalidating a conviction." *Id.* The court found that a claim alleging that judicial hostility impaired counsel's zealousness usually implicates the right to a fair trial. The court noted that

> [w]hen no objection is made at trial to the circumstances allegedly constraining defense counsel's freedom to act in her client's best interests, ... review [is] only for plain error, in keeping Fed. R.Civ.P. 52(b). Under the standard set forth by that Rule, the defendant must show that the court's error was "particularly egregious," and [the court is] to correct only those errors that "seriously affect the fairness, integrity or public reputation of judicial proceedings."

*Id.* (citations omitted).

The court reasoned that virtually any rebuke from the court sufficient to create a conflict of interest would create an ineffective assistance of counsel claim, which Shark could demonstrate by showing deficiency of performance and prejudice. The court held that Shark could not "avoid those requirements by seeking to make out a claim of ineffective assistance of counsel under the more lenient ... standard when the asserted conflict of interest is said to arise from ordinary friction between a judge and defense counsel at trial." *Id.* As such, Shark's motion for a new trial based on the alleged conflict of interest created by Judge Richey must be denied.

## B.

Shark alleges that there were two instances of prosecutorial misconduct during the trial which violated his Sixth Amendment rights. First, Shark alleges that the prosecutor knowingly used perjured testimony during the course of trial. Second, Shark alleges that the government failed to disclose previous instances of perjury by Johnny St. Valentine Brown ("Brown"), a police detective, in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

■ Turning to the first allegation, Shark alleges that the prosecutor, Assistant United States Attorney Kenneth Kohl ("Kohl"), distorted testimony by two codefendants to substantiate the forfeiture amount alleged in the indictment. Mot. at 33. Shark claims that Kohl knew the codefendants had pled to forfeiture amounts of $7,420.00, yet asked both to tell the jury what forfeiture amounts they had been charged with in order to solicit answers of $117,600.00. *Id.* Kohl then used this as evidence to support Shark's forfeiture amount in his closing argument. *Id.* Shark alleges that Kohl's extrapolation

was not just a harmless exaggeration, but led to an impermissibly determined quantity used in sentencing. *Id.* at 34. Shark alleges that

> Kohl deliberately sought to have the cooperating co-defendants testify to an amount that he knew neither had pled guilty to in their forfeiture count. Kohl's efforts to get a misleading factor on which to make a forfeiture determination was calculated to mislead the jury and the sentencing court. He later used the false premise establish [sic] in the testimony of [the co-defendants] in his closing argument.

Mot. at 33–34.

The government does not directly respond to whether this amounts to a violation of Shark's Sixth Amendment rights. However, when discussing whether Roberts's failure to object to Kohl's closing argument might be ineffective assistance of counsel, the government argues that Shark cannot establish that he was prejudiced by this argument since there were other witnesses who corroborated his participation in the conspiracy. Gov't Opp'n at 39.[4] Several witnesses testified about Shark's participation, Shark was free to cross-examine them, and the jury was free to evaluate their credibility. Furthermore, the Court keeps in mind that the prosecutor's closing arguments are not evidence, and that the jury was instructed as much. Final Jury Instructions of the Hon. Charles R. Richey (filed July 22, 1993) [# 191] at 4. Considering this, the Court holds that Shark has failed to establish prosecutorial misconduct as to Kohl's closing arguments.

■ Turning now to the testimony of Detective Brown, Shark alleges that the government violated his Sixth Amendment right to a fair trial when it failed to disclose that Detective Brown had committed perjury on multiple occasions by testifying falsely as to his academic credentials. Shark argues that under *Brady*, the government had an obligation to turn over this information. The Supreme Court has determined that the government has an obligation to turn certain types of information over to the defense. As the Supreme Court has held,

> [t]here are three components of a true Brady violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.

*Strickler v. Greene*, 527 U.S. 263, 281–82, 119 S.Ct. 1936, 1948, 144 L.Ed.2d 286 (1999).

Shark argues that the information regarding Brown's perjury easily meets at least the first two criteria—namely that it could have been used to impeach his testimony and that it was not revealed to the defendant. Mot. at 36. Shark argues that he was prejudiced by this omission since Brown testified as an expert witness on the practices of drug traffickers. Mot. at 36.

The government contests that a Brady violation occurred. First, the government argues that defendant has failed to establish that Detective Brown testified falsely to the jury hearing Shark's case The government argues that Brown did not testify at all about his academic credentials—his testimony was based solely on his law enforcement experience and "street" experience. Gov't Opp'n at 41. Second, the

4. All references to "Gov't Opp'n" refer to the government's opposition filed on January 22, 2001 [# 417].

government argues that it could not have turned over the information in 1993, when Shark's trial occurred, because the perjury occurred in July 1999, when Brown lied about his academic credentials during a civil deposition. *Id.* The government contends that it never had any information about Brown's perjury at the time of Shark's trial, and that such knowledge cannot be imputed to it. *Id.* at 41–43.

The Court must conclude that Shark has failed to establish that he was prejudiced by Brown's testimony. First, Shark has failed to establish that Brown testified about his academic credentials, the subject of the subsequent perjury, at trial. Shark even concedes as much. Mot. at 37. Furthermore, as Brown's perjury in a civil deposition had not yet occurred, defendant is not able to contradict the government's contention that it did not possess information about Brown's possible perjury. Since the government did not have such information, it could not have disclosed it. This result is consistent with other cases in this court. *See United States v. Davis,* 113 F.Supp.2d 1, 4–5 (D.D.C.2000)(Harris, J.); *United States v. Spinner,* 109 F.Supp.2d 18, 20–21 (D.D.C.2000)(Friedman, J.); *United States v. Williams,* 77 F.Supp.2d 109 (D.D.C.1999)(Hogan, J.); *but see United States v. Jones,* 84 F.Supp.2d 124 (D.D.C.1999)(Sporkin, J.). As such, Shark's motion for a new trial based on prosecutorial misconduct must be denied.

### C.

Shark alleges multiple instances of ineffective assistance by his trial counsel at all stages of proceedings—before the trial, during the trial, and during sentencing. Shark alleges that all of these errors resulted from Mark Rochon ("Rochon") withdrawing from the trial at the last minute and substituting his partner, Michelle Roberts ("Roberts"), as trial counsel. According to Shark, Rochon made the substitution since he felt that he did not get along well with Judge Richey. Mot. at 19. Although Shark initially objected to the substitution, he eventually agreed. *Id.*

Before the trial, Shark alleges Roberts made the following mistakes: 1) that she failed to perform a complete factual and legal review; 2) that she failed to seek copies of the plea agreements of cooperating co-defendants; 3) that she failed to investigate the background of testifying officers; 4) that she failed to interview cooperating co-defendants; 5) that she failed to locate and interview a witness who could have corroborated Shark's story; 6) that she failed to timely review audio/video tapes and transcripts; 7) that she failed to review the tapes and transcripts with Shark; 8) that she failed to find "Tutu," a prostitute Shark was allegedly visiting when he was arrested; and 9) that she failed to discuss the possible sentencing guidelines with Shark.

During the trial, Shark alleges Roberts made the following mistakes: 1) that she withdrew a motion to suppress transcripts of audio tapes after a confrontation with Judge Richey over the timeliness of the objection and his alleged threat to penalize her firm, and that she also withdrew the motion without consulting Shark; 2) that she failed to demand an evidentiary foundation for the tapes; 3) that she failed to object to impermissible closing arguments by the prosecutor; 4) that she failed to point out inconsistencies in the testimony of the police officers; 5) that she failed to allow Shark to testify on his own behalf; and 6) that she failed to bring Shark up to the bench for bench conferences.

During sentencing, Shark alleges Roberts made the following mistakes: 1) that she failed to object to application of the career offender enhancement; and 2) that

she failed to object to the amount of drugs Shark was deemed responsible for.

These various claims of ineffective assistance of counsel must be rejected. First, the D.C. Circuit has already considered and rejected Shark's ineffective assistance claim regarding Roberts's withdrawal of the motion to suppress transcripts of the audiotapes. *Shark*, 311 U.S.App.D.C. 182, 184–84, 51 F.3d 1072, 1074–75 (1995)(concluding that withdrawal of the objection in exchange for having Shark's name deleted from the transcript and a favorable jury instruction was a tactical choice).

Shark's remaining ineffective assistance claims are governed by *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), in which the Supreme Court held that

> [a] convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction ... has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064.

Under *Strickland*, the defendant is required to show both deficiency of performance and prejudice. In order to establish that an attorney's performance was deficient, "the defendant must show that counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688, 104 S.Ct. at 2064. When considering whether counsel's performance was deficient, the Court cautioned that "[j]udicial scrutiny of counsel's performance must be highly deferential," that the court must not "second-guess," and that "every effort be made to eliminate the distorting effects of hindsight." 466 U.S. at 689, 104 S.Ct. at 2065. To that end, "a court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." 466 U.S. at 690, 104 S.Ct. at 2066.

If the defendant can demonstrate that there was a deficiency in performance, the defendant must still show that he was prejudiced by that deficiency. Unless the claim involves denial of assistance, interference with assistance by the state, or instances where counsel is burdened by a conflict of interest, a presumption of prejudice does not attach. 466 U.S. at 692, 104 S.Ct. at 2067. In cases where the presumption of prejudice does not attach, prejudice must be shown, and "it is not enough for defendant to show that the errors had some conceivable effect on the outcome of the proceeding. Virtually every act or omission of counsel would meet that test." 466 U.S. at 693, 104 S.Ct. at 2067. Rather, "[the] defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." 466 U.S. at 694, 104 S.Ct. at 2068.

Before turning to the specifics of Shark's ineffective assistance claims, the Court takes note of the Supreme Court's instruction on how to approach such claims. Although defendant is required to demonstrate both deficiency and prejudice, the district court does not have to "approach the inquiry in the same order or

even ... address both components of the inquiry if the defendant makes an insufficient showing on one." *Strickland,* 466 U.S. at 697, 104 S.Ct. at 2069. Under *Strickland,* Shark's ineffective assistance claims must fail for failure to demonstrate that the alleged conduct was deficient, or that he suffered prejudice from it, or both.

■ With regards to Roberts's alleged failure to perform a complete factual and legal review, this claim is vague since Shark does not specifically point out what Roberts might have done differently. As such, Shark does not demonstrate that Roberts's conduct was deficient.

■ With regards to Roberts's alleged failure to seek copies of the plea agreements of cooperating co-defendants, and failure to interview the cooperating co-defendants, Shark has failed to demonstrate a reasonable probability that the outcome of the trial was affected. Furthermore, the trial transcript reflects that Roberts did cross-examine the co-defendants with regards to their plea agreements and Shark does not specify any other rebuttal evidence his counsel missed. As such, the Court would be hard-pressed to conclude that Roberts was deficient.

With regards to Roberts's alleged failure to investigate the background of the testifying police officers, this claim appears to primarily focus on Detective Brown who, in 1999, was discovered to have perjured himself in multiple cases regarding his academic credentials. Shark concedes that Brown's testimony was limited to his law enforcement experience and not his supposed academic credentials. Mot. at 37. Furthermore, Shark has failed to demonstrate that Brown perjured himself prior to the trial. As such, Shark is unable to demonstrate prejudice.

■ With regards to Roberts's alleged failure to timely review the tapes and tran-

scripts, Shark claims that Roberts waited too long to review the tapes and failed to have them transcribed herself, "foreclosing the possibility of having a neutral witness come in to discredit the government's most damaging piece of evidence." Mot. at 23. Even if this conduct could be considered deficient, Shark has failed to demonstrate that he suffered any prejudice as a result. In reaching this conclusion, the Court considers the other evidence presented against him. As for Shark's claim that Roberts never reviewed the tapes with him, Shark only makes a generalized argument that he could have explained to Roberts what was transpiring on the tapes. Shark does not claim Roberts missed something which would have changed the result of the trial.

■ With regards to Roberts's alleged failure to locate "Tutu," Shark claims that "Tutu" is a prostitute who allegedly could have corroborated that Shark was at the hotel to procure her services at the time of his arrest. However, Shark does not demonstrate that Roberts was deficient in failing to locate her. Shark's statement that Roberts failed to look for "Tutu" is conclusory and not supported by any evidence. Furthermore, as the government points out, in his motion "[Shark] says nothing ... about the sufficiency of the information he allegedly provided to counsel to assist her in locating 'Tutu,' or anything to suggest that 'Tutu' was even capable of being found." Gov't Opp'n at 38. At the evidentiary hearing, both Shark and his brother testified that they did not know "Tutu's" real name or an address where she could be located. As such, Shark has failed to demonstrate that Roberts was deficient. The Court also concludes that Shark has failed to demonstrate prejudice on this point. Even if "Tutu" testified that Shark was visiting her for the reason he says he was, Shark has not argued that

"Tutu" could account for his whereabouts during the entire course of the night in question. Furthermore, given her potential Fifth Amendment privilege against self-incrimination, there is no guarantee "Tutu" would have even testified.

This same analysis applies equally to Shark's allegation that Roberts failed to locate "Miss Dee," a woman who would have testified that she did not introduce Shark to one of his co-defendants. At the evidentiary hearing, both Shark and his brother testified that they only knew this witness as "Miss Dee," that they did not know her real name, and that they did not know an address where she could be located. Furthermore, Shark cannot be said to have been prejudiced due to the absence of "Miss Dee's" proffered alibi. Her alleged alibi, even if accepted as true, only proves that she did not introduce Shark to the co-conspirators, not that Shark was uninvolved in the crimes for which he was convicted.

With regards to Roberts's alleged failure to demand an evidentiary foundation for the tapes, Shark claims that Roberts failed to either seek to stipulate to a version of the transcript with the government, seek a pre-trial determination as to the admissibility of the tapes and transcripts, or provide an alternative transcript to the jury for comparison. Mot. at 27. Shark claims that Roberts should have at least provided an alternative transcript after failing to get the transcripts suppressed. *Id.* The government responds that the admissibility of the tapes themselves was left to trial judge's discretion, and that the police officers involved authenticated them. Gov't Opp'n at 39. Therefore, there was no error with regards to the tapes. Furthermore, Shark has failed to demonstrate a reasonable probability that the outcome of the trial would have been different had Roberts requested such a hearing.

With regards to Roberts's alleged failure to object to an impermissible closing argument by the prosecutor, Shark is referring to arguments by the prosecutor that Shark participated in the conspiracy beyond the period of time testified to by co-defendant Hayes. However, Shark has failed to demonstrate prejudice. As the government points out, at least three other witnesses testified as to the length of time. In any event, Shark has not demonstrated a reasonable probability that the outcome of the trial would have been different had Roberts objected, especially considering the totality of the evidence presented.

With regards to Roberts's alleged failure to point out inconsistencies in the testimony of the police officers, Shark is referring to the testimony of Officer Gary Curtis. Shark alleges that Officer Curtis's testimony before the Grand Jury and at trial were marred by several inconsistencies. Shark argues that the inconsistencies apply to the amount of drugs involved and who was in the room. Mot. at 28. While Shark provided the Court with transcripts of two of Officer Curtis's appearances before the Grand Jury—on October 15, 1992, and November 17, 1992—no transcript was provided for his testimony at trial. Therefore, this claim is impossible to evaluate. Shark has failed to meet his burden of showing deficiency or prejudice.

With regards to Roberts's alleged failure to put Shark on the stand and her alleged failure to include him in bench conferences, both of these arguments were raised for the first time at the evidentiary hearing. With regards to failing to put Shark on the stand, the Court finds that Roberts did not act in a deficient manner. At the evidentiary hearing, Roberts testified that she was reluctant to call Shark as a witness due to his prior convictions, but that she would have called him had he

insisted. Shark has failed to demonstrate that he ever insisted on testifying, either before or during the trial. Indeed, the Court finds that Shark understood and agreed with Roberts's advice regarding this tactical choice. With regards to failing to include Shark in bench conferences, Shark has not demonstrated that he was prejudiced by this. The court of appeals has already settled that Roberts's withdrawal of her objection to the audiotape transcripts was not ineffective assistance of counsel, so any argument Shark might make that he would not have authorized the withdrawal of the objection had he been included in the bench conference is moot.

■■■■ With regards to Roberts's alleged failure to discuss the possible sentencing guidelines with Shark prior to trial, the Court concludes that Shark has failed to demonstrate prejudice. For example, Shark cannot demonstrate that the result of his trial and sentencing would have been different had Roberts explained the intricacies of the sentencing guidelines with him prior to trial. Furthermore, at the evidentiary hearing, both Shark and his brother testified that Roberts did indicate the statutory terms of incarceration he might be facing if convicted. With regards to Roberts's alleged failure to review the presentence report, the record reflects that defendant signed the "Receipt and Acknowledgment of Presentence Investigation Report," a copy of which is attached to the government's opposition (Exh. J). Furthermore, the transcript of the sentencing proceeding reflects that Roberts did make objections to the PSR with regards to Shark's criminal history and drug amount.

With regards to sentencing, Shark alleges that Roberts made two errors. Shark alleges that Roberts failed to object to the career offender enhancement, and that she failed to object to the amount of drugs Shark was deemed responsible for. However, the sentencing transcript reflects that Roberts did have a lengthy exchange with Judge Sporkin as to the appropriateness of the career offender provision. In any event, both the government and the probation office have agreed that the career offender provision was misapplied. Therefore, Shark will be resentenced. As such, this claim is moot, since resentencing would be the remedy Shark would be entitled to if he could demonstrate ineffective assistance of counsel at sentencing.[5]

Considering all of these arguments, the Court concludes that Shark has failed to meet his burden for establishing ineffective assistance of his trial counsel during pre-trial, trial, and sentencing.

### D.

■■■■ Shark argues that his appellate counsel, Ralph Martin, also provided ineffective assistance of counsel. Specifically, Shark argues that his appellate counsel was ineffective because he failed to adequately appeal his sentence as a career offender in light of *United States v. Price*, 301 U.S.App.D.C. 97, 990 F.2d 1367 (1993), which established that conspiracy to distribute drugs could not serve as an instant offense for application of the career offender provision. Mot. at 17.

Before deciding whether appellate counsel's performance was deficient in this regard, the Court notes that the government has already conceded that under *Price*,

---

**5.** A similar result must be reached with regards to Roberts's alleged failure to object to the amount of drugs Shark was responsible for. In light of Judge Sporkin's determination that the amount was not important due to application of the career offender provision, Roberts's conduct can hardly be considered deficient in this regard.

Shark should not have been convicted as a career offender using conspiracy as the instant offense of conviction. Gov't Opp'n at 32. The probation office is also in agreement on this point.

However, just because Shark is entitled to have his sentence recalculated does not by itself establish that appellate counsel was ineffective. The *Strickland* standards apply to appeals as well as to trials, and Shark will have to show that appellate counsel's performance was legally deficient as well as that he was prejudiced by it. *See United States v. Williamson,* 183 F.3d 458, 462 (5th Cir.1999).

In determining whether appellate counsel's claim was deficient, the Court must evaluate how appellate counsel addressed the *Price* issue on appeal. Appellate counsel did not cite *Price* in his initial brief.[6] *See* Brief for Appellant Charles Shark (Evidentiary Hearing—Gov't Exh. 4). Appellate counsel did raise the *Price* issue in his reply brief. *See* Reply Brief for Appellant Charles Shark (Evidentiary Hearing—Gov't Exh. 6) at 15–16. The court of appeals did not address *Price* in its opinion denying Shark's appeal. Appellate counsel then raised the *Price* issue in its appeal from the appellate panel's decision. *See* Appellant Charles Shark Petition for Rehearing and Suggestion for Rehearing *en banc* (Evidentiary Hearing—Gov't Exh. 7) at 2, 11.

At the evidentiary hearing Shark's current counsel argued that failure to raise the *Price* issue in the initial brief virtually doomed it, since appellate courts are not bound to consider issues raised for the first time in a reply brief. Even if the Court accepts this argument, the Court is still hard-pressed to conclude that appellate counsel's performance was deficient.

At the evidentiary hearing, appellate counsel testified that he prepared for the appeal by reviewing the trial and sentencing transcripts, Roberts's file, and by consulting with the defendant. Appellate counsel stated that he chose to focus the appeal on the conflict of interest issue between Judge Richey and Michelle Roberts. He then switched his focus in the reply brief, choosing to focus on sentencing issues, including the effect of *Price*. This strategy was in line with his goal to secure Shark a new trial or, at the very least, resentencing. Appellate counsel testified that the oral argument before the appellate panel focused on the conflict of interest issue, although he admitted that the sentencing issue was equally important. Whether a different attorney might have approached these issues in a different manner is not the issue before this Court. This Court must determine whether appellate counsel proceeded in a deficient manner. Considering the records before the Court, such a conclusion is not possible. It is uncontested that Ralph Martin raised the *Price* issue in at least two different pleadings. The failure of the court of appeals to address the applicability of *Price* was not in his control. As such, Shark has failed to demonstrate that he suffered from ineffective assistance of counsel during his appeal.

### E.

In conclusion, the Court holds that Shark has failed to demonstrate sufficient grounds for a new trial. Shark has failed to demonstrate that Judge Richey created an impermissible conflict of interest. Shark has failed to demonstrate prosecutorial misconduct. Shark has failed to dem-

---

**6.** *Price* was decided on April 23, 1993. Shark's initial brief was filed on September 13, 1994.

onstrate ineffective assistance of counsel by both his trial and appellate attorneys. Therefore, Shark's motion for a new trial on these grounds is denied.

### II. Grounds pertaining to the sentence

In his attack on the sentence imposed by Judge Sporkin, Shark alleges that two mistakes were made. First, Shark alleges that Judge Sporkin incorrectly applied the sentencing guidelines career offender enhancement to him. Second, Shark alleges that the jury never made a finding as to the precise amount of drugs he was responsible for. As such, any sentence which takes into account an amount of drugs is impermissible.

### A.

The Court shall first consider Shark's arguments with regards to application of the career offender provision. The court of appeals did consider the application of the career offender provision on direct appeal. However, the court's decision was limited to whether Judge Sporkin "wrongly thought himself to lack any discretion to depart downward." *Shark*, 311 U.S.App. D.C. at 187, 51 F.3d at 1077. The court held that Judge Sporkin was aware of his discretion and Shark's attack on his sentence on that ground was denied. *Id.*

Although the court of appeals did review Shark's sentence on direct appeal, this Court is now being asked to consider a new attack on the sentence. Shark now argues that the career offender provision was incorrectly applied to him. The Court begins by reviewing the precise language of the career offender provision. USSG § 4B1.1 provides, in relevant part, that [a] defendant is a career offender if (1) the defendant was at least eighteen years old at the time the defendant committed the instant offense of conviction, (2) the instant offense of conviction is a

felony that is either a crime of violence or a controlled substance offense, and (3) the defendant has at least two prior felony convictions of either a crime of violence or a controlled substance.

Adopting the conclusion of the original presentence investigation report ("PSR"), Judge Sporkin found that the career offender provision applied to Shark. Considering the elements of USSG § 4B1.1, the Court found that Shark was at least 18 years old, and that the instant offense, conspiracy to distribute drugs, was a felony that was a controlled substance offense. As for the final element, the PSR described at least two prior felony convictions—one for robbery in November 1974 (PSR ¶ 48), and one for attempted robbery in December 1981 (PSR ¶ 49).

Shark argues, and the Court agrees, that two errors occurred in Shark's career offender sentence. First, Judge Sporkin used the conspiracy count as the qualifying instant offense of conviction, in contravention of *Price*. Second, the PSR contained an inaccurate description of one of the two previous offenses used as a basis for application of the career offender provision. The Court shall address each error in turn.

The first issue is whether conspiracy to distribute drugs qualifies as an instant offense of conviction for the purpose of the career offender provision. At the time of Shark's sentencing, the prevailing law of this circuit was that conspiracy to distribute drugs did not qualify as an instant offense of conviction for the purpose of applying the career offender provision. *United States v. Price*, 301 U.S.App.D.C. 97, 990 F.2d 1367 (1993)(holding that conspiracy to distribute drugs is not a controlled substance offense because it requires different ele-

ments than distribution).[7] In 1994 the Sentencing Commission amended the sentencing guidelines to include conspiracy. However, the D.C. Circuit has held that this cannot be retroactively applied under the *ex post facto* clause of the United States Constitution. *See United States v. Gaviria*, 325 U.S.App.D.C. 322, 336, 116 F.3d 1498, 1513 (1997). As such, Shark should not have been sentenced as a career offender based on the conspiracy conviction.

The government has conceded this point. Gov't Opp'n at 32. However, the government contends that the career offender provision still applies since the conviction of unlawful distribution of cocaine base clearly qualifies as a controlled substance offense. In response, Shark argues that the Court is bound to make its determination on whether the career offender provision applies solely by using the top count of the conviction, in this case the conspiracy conviction. Shark argues that this result is consistent with the grouping principles found in USSG Ch.3, Pt. D. However, Shark has provided no authority to support that argument, and the Court has discovered none. As Shark was convicted of unlawful distribution of cocaine base in violation of 21 U.S.C. § 841, he may be sentenced as a career offender if he has two other convictions which are either crimes of violence or controlled substance offenses.

This brings the Court to Shark's second argument, namely that he does not have two prior felony convictions which count as crimes of violence for purposes of the career offender provision. Before turning to that question, the Court will first describe the factual circumstances surrounding the prior felony convictions at issue. As the Court previously noted, the PSR described at least two prior felony convictions—one for robbery in November 1974 (PSR ¶ 48), and one for attempted robbery in December 1981 (PSR ¶ 49).

The factual circumstances surrounding the November 1974 robbery are not disputed. According to the PSR, Shark was arrested on November 20, 1974, and was subsequently convicted of robbery with a deadly weapon by the Circuit Court of Prince George's County, Maryland. PSR ¶ 48. This conviction clearly qualifies as a prior felony conviction that was a crime of violence.

The factual circumstances surrounding the December 1981 attempted robbery are not so clear. Shark was arrested on December 11, 1981, and was subsequently convicted of attempted robbery by the District of Columbia Superior Court. That case is Docket No. F–07297–81. PSR ¶ 49. According to Shark, the factual circumstances describing that attempted robbery related to another charge of attempted robbery from September 16, 1981. That charge, Docket No. F–07296–81 in the District of Columbia Superior Court, was not prosecuted. The probation office has since conceded this factual mistake and has updated its presentence investigation report.

In a memorandum dated November 2, 1999, the probation office provided this Court with the factual circumstances surrounding the incident which led to the arrest on December 11, 1981, which Shark has not disputed. According to the probation office, the armed robbery conviction

involved Shark going to the United National Bank at 1400 Montana Avenue, NE, Washington, DC, on September 14, 1981, and presenting a teller with a de-

---

7. Shark was sentenced on October 29, 1993. Since *Price* was decided on April 23, 1993, it was in effect at the time.

mand note which was folded. The teller was busy and, therefore, Shark had to wait. The waiting made him nervous and impatient according to a investigation report. The teller read the note, which said something to the effect of "please stay calm. I want all you valuable and your money." The teller then walked away from the window. The defendant retrieved the note and exited the bank. The teller noted that the defendant was carrying a white paper bag and appeared to place the note in the bag.

Probation Office Memorandum (dated Nov. 2, 1999).[8]

Having established the factual circumstances surrounding the December 1981 attempted robbery, the Court must now determine whether this prior felony conviction qualifies as a crime of violence for the purposes of the career offender provision. Shark argues that it does not for two reasons. First, Shark argues that attempted robbery does not qualify as a "crime of violence." Second, Shark argues that since the factual circumstances of his particular offense were not violent, it cannot be considered a "crime of violence."

■■■ The first argument is easily disposed of. The Court has reviewed editions of the sentencing guidelines as far back as 1990. In the 1993 guidelines, which were in effect at the time of Shark's sentencing, robbery is categorized as a "crime of violence," and "the terms 'crime of violence' and 'controlled substance offense' include the offenses of aiding and abetting, conspiring, and attempting to commit such offenses." USSG § 4B1.2, Application Note 1. The meaning of the application note is clear. The Court holds that an attempted robbery conviction is a prior

felony conviction that qualifies as a crime of violence for the purpose of applying the career offender provision.

■■■ Shark next argues that even if attempted robbery can be categorized as a "crime of violence," the factual circumstances of his own particular offense were not violent, rendering the "crime of violence" designation inappropriate. However, this circuit does not look to the underlying factual circumstances of a crime to determine whether it qualifies as a "crime of violence" for the purpose of applying the career offender provision.

In *United States v. Chatman*, 300 U.S.App.D.C. 97, 986 F.2d 1446 (1993), the court held that "the definition of 'crime of violence' in section 4B1.2 is a distinctively crafted 'term of art,' designed to identify career offenders. The definition extends not only to crimes that involve actual violence, but to many crimes that have an 'unrealized prospect of violence' as well." *Chatman*, 300 U.S.App.D.C. at 102, 986 F.2d at 1451 (citations omitted). The court further noted that it was possible some crimes that are not necessarily violent could be "crimes of violence" for the purpose of applying the career offender provision. The court reasoned that section 4B1.2

> can be read as depriving career offenders of the benefit of the doubt, and assuming the worst. In the service of identifying particular trends within an individual's criminal history, section 4B1.2 appears to characterize as 'crimes of violence' many offenses that, taken individually on their face, might be interpreted as non-violent.

*Id.* (citations omitted).

Pursuant to *Chatman*, the Court must reject Shark's proposal to look at the spe-

**8.** The probation office's November 2, 1999, memorandum was provided to defendant, and defendant filed a response to it. *See* Re- sponse to the USPO Memorandum (filed Jan. 21, 2000) [# 392].

cific facts and will categorize his attempted robbery conviction as a "crime of violence" for the purpose of applying the career offender provision. The Court has considered Shark's argument that the offense should be evaluated by its specific facts without regard to category, and concludes that this approach must be rejected for two reasons. First, the facts and what they mean are not clear to the Court. Shark has testified that he was not carrying a weapon during the attempted robbery, and that the teller must not have felt threatened, as evidenced by the fact that she got up and walked away from him. Unfortunately, almost twenty years after the fact, the Court has no way to determine whether Shark's rendition of the incident is reliable. Even if Shark's perception of the event is reliable, it does not address the *Chatman* standard of "unrealized prospect of violence." The fact remains that Shark walked into a bank holding a bag and presented a teller with a note demanding she turn over money and valuables. Whether or not Shark would have harmed her for failure to comply is beside the point. Whether or not she was paralyzed with fear or was able to get up from her chair and walk away from the window is as well. Second, and perhaps more importantly, consistency in the application of the career offender provision would be undermined if courts began to apply a case-by-case approach. The categories of prior felony convictions that qualify as "crimes of violence" are clear.[9]

Considering all of this, the Court holds that the requirements of USSG § 4B1.1 are satisfied, and that Shark should be sentenced as a career offender. Shark was at least 18 years old at the time he committed the instant offense of conviction. The instant offense of conviction, unlawful distribution of cocaine base, is a controlled substance offense. Finally, Shark has at least two prior felony convictions of a crime of violence—the 1974 robbery with a deadly weapon in Prince George's County, Maryland, and the 1981 attempted robbery in the District of Columbia. Although Shark was originally sentenced as a career offender, an impermissible instant offense and erroneous prior felony conviction were used to justify it. Therefore, Shark shall be resentenced based on the proper instant offense and prior felony convictions.

## B.

Having determined that Shark should be sentenced as a career offender, the Court comes to Shark's final attack on his sentence, namely that the jury failed to make a finding beyond a reasonable doubt as to the amount of drugs Shark can be held responsible for. Although Shark is being sentenced as a career offender, the amount of drugs is still important since the statutory maximums and guideline base offense levels for drug offenses are determined by the amount of drugs involved. In this case, the base offense level under the career offender provision is determined based on the statutory maximum sentence, and the statutory maximum sentence for distribution is based on the drug amount.

In order to determine what Shark's statutory maximum sentence is, the Court must look at the instant offense of conviction. According to the verdict form, the jury unanimously found that, as to Shark,

9. *See* USSG § 4B1.2, Application Note 1 ("'crime of violence' includes murder, manslaughter, kidnapping, aggravated assault, forcible sex offenses, robbery, arson, extortion, extortionate extension of credit, and bur- glary of a dwelling"). As the Court has noted, USSG § 4B1.2, Application Note 1, also provides that an attempt to commit one of these offenses is included as a "crime of violence."

the government had proved beyond a reasonable doubt each element of the offense of distribution of a controlled substance, namely a mixture or substance containing a detectable amount of cocaine base, also known as crack, on September 30, 1992, in violation of Title 21, U.S.Code, Sections 841(a)(1) and (b)(1)(B)(iii), and Title 18 U .S.Code, Section 2.

Verdict Form (filed July 22, 1993)[# 189].

Although the jury found Shark guilty of the statutory offense of distribution of cocaine base, the jury never made a determination as to any amount, in part because the jury was never asked to do so. With regards to the amount of drugs in question, Judge Richey specifically instructed the jury not to consider amounts by telling it that

[a]lthough the Indictment specified the amount of cocaine base allegedly involved in both Count One and Count Two of the Indictment, the government is not required to prove the amount of cocaine base, or crack, allegedly involved. The amount, weight, and quantity of drugs is not an issue in this case. The law requires only that the indictment give the defendant notice of the quantities of drugs allegedly involved. You are only to determine whether the government has proved beyond a reasonable doubt each of the elements of Count One and Count Two which I will explain to you in just a moment.

Final Jury Instructions of the Honorable Charles R. Richey (filed July 22, 1993)[# 191] at 15.[10]

After reviewing the jury instructions and the verdict form, the Court must conclude that there was never a jury determination made with regards to the amount of drugs Shark was guilty of unlawfully distributing. The jury only found that Shark was responsible for unlawfully distributing a detectable amount of cocaine base. Judge Richey determined the actual amounts necessary for conviction—50 grams or more for the conspiracy charge and 5 grams or more for the distribution charge—by a preponderance of the evidence.

In its presentence investigation report, the probation office held Shark responsible for conspiring to unlawfully distribute 1010.25 grams of cocaine base. This amount was based on

trial testimony [that] the defendant received $1,100 for each ounce of cocaine he delivered to the crack house. The drugs were broken down into "20's" and "50's" and thereby generated an additional $1,100 to $2,200 income from each ounce delivered by defendant Shark. Therefore, if each ounce of crack delivered by Shark produced $1,100 of revenue for him and another $2,200 of revenue for his co-defendants, then [the] jury's finding of $117,600 on the forfeiture count means that the jury concluded that Shark delivered at least 35.636 ounces of cocaine base during his tenure in the conspiracy. (This quantity is based on dividing $117,600 by $3,300 which equals 35.636 ounces. 35.636 ounces equals 1010.25 grams of cocaine base.)

PSR ¶ 28.

Shark challenges the determination of this amount primarily because it was not made by either the jury or the judge. Shark argues that this determination contravenes the express holding of *Apprendi v. New Jersey*, 530 U.S. 466, 490, 120 S.Ct.

---

**10.** The Court notes that this instruction was then common practice in the trial of drug cases, in this circuit and around the country.

2348, 2362–63, 147 L.Ed.2d 435 (2000), in which the Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." This holding has since been applied to similar drug cases pending on appeal at the time *Apprendi* was decided. Recently, the D.C. Circuit has held that

> [i]n light of *Apprendi*, it is now clear that, in drug cases under 21 U.S.C. §§ 841 and 846, before a defendant can be sentenced to any of the progressively higher statutory maximums that are based on progressively higher quantities of drugs specified in subsection 841(b)(1)(A) or (B), the Government must state the drug type and quantity in the indictment, submit the required evidence to the jury, and prove the drug quantity beyond a reasonable doubt.

*United States v. Fields,* 345 U.S.App.D.C. 205, 242 F.3d 393, 396 (2001)("*Fields I*"); *see also United States v. Fields,* 251 F.3d 1041, 1043 (D.C.Cir.2001)("*Fields II*")(affirming *Apprendi's* application to drug cases in which the prescribed statutory maximum depends upon the amount of drugs involved); *In re Sealed Case,* 246 F.3d 696, 699 (D.C.Cir.2001)(same).[11]

Of course, the Court assumes the D.C. Circuit applied *Apprendi* to *Fields I* since that case was similarly situated, i.e. on direct appeal at the time *Apprendi* was decided. However, Shark is before the Court on collateral review, not direct appeal. In its opposition to Shark's 2255 motion and at oral argument, the government argues that *Apprendi* should not be applied retroactively. Thus the Court must now consider the threshold question of whether *Apprendi* may be applied retroactively in this case. If so, then the non-jury determination of the amount of drugs Shark was responsible for would be erroneous.

■ The retroactive application of new rules to criminal cases on collateral review was considered at length by the Supreme Court in *Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989). Under *Teague,* the Court must first determine whether *Apprendi* announced a new rule. The Court concludes that *Apprendi* did announce a new rule. As another district court has held, *Apprendi* "drastically changed the legal landscape" because "for many years prior to *Apprendi* the established precedent in this Circuit, and, for that matter, in every other Circuit, was that drug quantity was a sentencing factor rather than an element of the crime defined in section 841(a)." *United States v. Johnson,* 126 F.Supp.2d 1222, 1224–25 (D.Neb.2000).

■ Since *Apprendi* announced a new rule, the Court must now determine whether that rule can be applied retroactively in Shark's collateral attack. In *Teague,* the Court held that "new rules generally should not be applied retroactively to cases on collateral review." *Teague,* 489 U.S. at 305, 109 S.Ct. at 1073. However, the Court recognized two exceptions to that general principle. "First, a new rule should be applied retroactively if it places certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe." *Teague,* 489 U.S. at 307, 109 S.Ct. at 1073. It is generally accepted that this exception does not apply to drug cases such as Shark's. *See United States v.*

---

11. The Court has read the D.C. Circuit's recent decision in *United States v. Webb,* 255 F.3d 890 (D.C.Cir.2001). After careful consideration, the Court concludes that *Webb* is inapplicable to the present case.

*Latney,* 131 F.Supp.2d 31, 33–34 (D.D.C.2001)(Hogan, J.); *United States v. Murphy,* 109 F.Supp.2d 1059, 1063 (D.Minn.2000).

▆▆▆ The second exception allows for a new rule to be applied retroactively "if it requires the observance of 'those procedures that are implicit in the concept of ordered liberty.'" *Teague,* 489 U.S. at 307, 109 S.Ct. at 1073 (citations omitted). That exception is reserved for "watershed rules of criminal procedure." *Teague,* 489 U.S. at 311, 109 S.Ct. at 1076. Such "watershed rules of criminal procedure" are "those new procedures without which the likelihood of an accurate conviction is seriously diminished." *Teague,* 489 U.S. at 313, 109 S.Ct. at 1077.

Several district courts have had occasion to consider whether *Apprendi* announced such a "watershed rule of criminal procedure" as to warrant its retroactive application to initial 2255 motions.[12] Specifically, several courts have considered whether *Apprendi* can be retroactively applied to drug conspiracy and distribution convictions where the jury was not required to find the drug amount beyond a reasonable doubt. Several of those district courts which have considered the issue have determined that the new rule in *Apprendi* is not a watershed rule of criminal procedure which requires retroactive application to convictions which have become final. *See United States v. Latney,* 131 F.Supp.2d 31, 33–35 (D.D.C.2001)(Hogan, J.); *see also United States v. Pittman,* 120 F.Supp.2d 1263, 1264–65 (D.Or.2000); *West v. United States,* 123 F.Supp.2d 845, 847 (D.Md. 2000); *Panoke v. United States,* 2001 WL 46941, at *2–3 (D.Haw. Jan.5, 2001); *Unit-*

*ed States v. Gibbs,* 125 F.Supp.2d 700, 706–07 (E.D.Pa.2000); *Ware v. United States,* 124 F.Supp.2d 590 (M.D.Tenn.2000); *United States v. Johnson,* 126 F.Supp.2d 1222, 1225–27 (D.Neb.2000); *see also Jones v. Smith,* 231 F.3d 1227 (9th Cir.2000)(in reviewing California's treatment of premeditation as a sentencing factor rather than an element of attempted murder, the Ninth Circuit declined to apply *Apprendi* retroactively, but limited its holding to particular facts).

The general rationale for the conclusion that *Apprendi* is not a watershed rule is best summarized by the court in *Gibbs.* *Gibbs* is factually similar to the present case in that Gibbs was indicted for and convicted of conspiracy to distribute cocaine. "In accordance with the law as it then existed, the court determined the drug quantity at the sentencing hearing and did so by a preponderance of the evidence." *Gibbs,* 125 F.Supp.2d at 702. Gibbs' conviction and sentence were affirmed on appeal.

After *Apprendi* was decided, Gibbs filed a timely collateral attack on his sentence. In rejecting Gibbs' argument, the district court held that

> [t]he lack of a jury finding as to drug quantity and the lack of such a finding made beyond a reasonable doubt does not call into question the validity of a verdict in the way a faulty reasonable doubt instruction does. What happened here did not infect the entire result. The role of the court in determining drug quantity did not render Gibbs' trial "fundamentally unfair or an unreliable vehicle for determining guilt or innocence." The evidence presented against

**12.** Several circuits have rejected the retroactive application of *Apprendi* to second or successive 2255 motions. *See, e.g., Sustache–Rivera v. United States,* 221 F.3d 8 (1st Cir. 2000); *In re Tatum,* 233 F.3d 857 (5th Cir.

2000); *Talbott v. Indiana,* 226 F.3d 866 (7th Cir.2000); *Hernandez v. United States,* 226 F.3d 839 (7th Cir.2000); *Rodgers v. United States,* 229 F.3d 704 (8th Cir.2000); *In re Joshua,* 224 F.3d 1281 (11th Cir.2000).

Gibbs, a leader of a violent drug conspiracy, was overwhelming. There is simply no basis to believe that the "likelihood of an accurate conviction is seriously diminished" by not applying *Apprendi* retroactively.

*Gibbs*, 125 F.Supp.2d. at 706.

However, at least three district courts have concluded that *Apprendi* is a watershed rule of criminal procedure as it requires the government to now prove drug type and quantity beyond a reasonable doubt. These courts have rejected the conclusion that *Apprendi* does not increase the accuracy of the proceeding or implicate fundamental fairness. *See United States v. Hernandez*, 137 F.Supp.2d 919, 929–932 (N.D.Ohio 2001)(holding that *Apprendi* is a watershed rule of criminal procedure); *United States v. Murphy*, 109 F.Supp.2d 1059, 1064 (D.Minn.2000); *Darity v. United States*, 124 F.Supp.2d 355 (W.D.N.C. 2000); *but see United States v. Sanders*, 247 F.3d 139 (4th Cir.2001).

▮ Having considered these two competing views, the Court concludes that, with respect to drug cases in which the statutory maximum sentence depends on the amount involved, *Apprendi* is a watershed rule of criminal procedure and must be applied retroactively to cases on collateral review. The Court "disagrees with the reasoning of the courts that have concluded that the *Apprendi* rule does not increase the accuracy of a conviction or sentence." *Hernandez*, 137 F.Supp.2d at 931. As that court reasoned,

prior to *Apprendi* the finding of certain facts that exposed a defendant to a sentence beyond the maximum penalty imposed by statute was made by a judge under a preponderance of the evidence standard. This Court must conclude that requiring these facts to be determined beyond a reasonable doubt will have a profound impact on the accuracy of the proceedings, thus implicating the fundamental fairness of the proceedings. To conclude otherwise trivializes the importance and purpose of that standard.

The Court not only finds that the rule in *Apprendi* increases the accuracy of the criminal proceedings, but also finds that it "alter[s] our understanding of the bedrock procedural elements essential to the fairness of the criminal proceeding."

*Hernandez*, 137 F.Supp.2d at 931–32 (citations omitted); *see also Apprendi*, 530 U.S. at 524, 120 S.Ct. at 2380 (O'Connor, J., dissenting)(noting that *Apprendi* "will surely be remembered as a watershed change in constitutional law").

The Court realizes that this result is at odds with the result reached in *Latney*. However, the section of that decision regarding *Apprendi's* retroactive application to cases on collateral review can be considered dicta, as the defendant in that case was not prejudiced by the new rule. Latney was sentenced to 168 months imprisonment, well below the 20 year statutory maximum in the catchall provision of 21 U.S.C. § 841(b)(1)(C). *Latney*, 131 F.Supp.2d at 34–35.

For the reasons stated herein, the Court concludes that *Apprendi* announced a watershed rule of criminal procedure which must be applied retroactively to cases on collateral review.

C.

▮ Having decided that *Apprendi* must be applied to cases on collateral review, the Court must now determine whether Shark is procedurally barred from raising the issue. If Shark's *Apprendi* claim was not raised on direct appeal, it is considered waived. A § 2255 motion cannot be used as a substitute for a direct appeal. *United States v. Addonizio*, 442 U.S. 178, 184, 99 S.Ct. 2235, 2240, 60

L.Ed.2d 805 (1979). It is widely recognized that failure to raise a ground for relief on direct appeal results in a waiver of that ground unless the petitioner can show cause to excuse his failure to appeal and actual prejudice, or actual innocence. *United States v. Frady,* 456 U.S. 152, 167, 102 S.Ct. 1584, 1594, 71 L.Ed.2d 816 (1982); *Bousley v.. United States,* 523 U.S. 614, 622, 118 S.Ct. 1604, 1611, 140 L.Ed.2d 828 (1998).

The Court has extensively reviewed the briefs filed on behalf of Shark with regards to his appeal. After reviewing the initial brief, the reply to the show cause order, and the reply brief, the Court has found no discussion with regard to non-jury determination of the amount. As Shark is not arguing actual innocence, he must therefore demonstrate cause and prejudice. If Shark is unable to demonstrate cause and prejudice, he will be procedurally barred from litigating this claim.

The Court finds that prejudice is clearly established in this case. If *Apprendi* is applied retroactively, the statutory maximum sentence Shark can receive is capped by 21 U.S.C. § 841(b)(1)(C), as the government failed to prove beyond a reasonable doubt the progressively higher drug quantities needed to implicate the progressively higher statutory maximums found in 21 U.S.C. § 841(b)(1)(A) and (B). The statutory maximum sentence in the catchall provision is 20 years. Shark was sentenced to 360 months, or 30 years. Therefore, Shark has been prejudiced by an additional ten years being added to his sentence.

The Court must now determine whether Shark can demonstrate cause. The Court begins by noting that two common arguments for establishing cause that might be applicable to this case—novelty and futility—are generally regarded as insufficient. *See Hernandez,* 137 F.Supp.2d at 933

("*Apprendi*-like arguments [are] not novel and have for years been argued on appeal"); *Bousley,* 523 U.S. at 623, 118 S.Ct. at 1611 ("futility cannot constitute cause if it means simply that a claim was 'unacceptable to [a] particular court at a particular time'"). As Shark has not presented any reason for the Court to stray from these general rules, the Court finds that novelty and futility are not sufficient grounds to establish cause in this case.

However, when considering the entire record in this case, the Court concludes that there is sufficient cause to excuse Shark from failing to raise an *Apprendi*-like issue on appeal. This is due to the confusion reflected in the transcript of the sentencing proceeding with regards to the amount of drugs Shark was responsible for. Judge Sporkin spent considerable time contemplating the amount of drugs Shark was responsible for, and heard alternative methods for calculating the amount. *See* Transcript of Sentencing Proceedings (Evidentiary Hearing—Gov't Exh. 29)("Sentencing Transcript") at 3–9 (considering defendant's proposed calculation), 9–12 (considering government's proposed calculation). As has already been mentioned, the probation office also presented the court with an amount based on the criminal forfeiture conviction. Despite having spent time considering how to calculate the amount of drugs Shark was responsible for, the sentencing judge never resolved the question. As the judge noted while addressing Shark directly,

I have considered everything here and I have looked at this record.

Whatever the amount of drugs involved-there is a large amount of drugs-whether you're right, whether the government is right, I don't think it really matters here because what happened here is that you're being sentenced as a career offender.

What you have here in order to meet that career offender criteria, two priors involving drugs or violence, you've got to be 18 years old, and the current crime has to be one of drugs or violence.

I think the record is clear that those criteria are here.

Sentencing Transcript at 34.

The Court is not unaware that the sentencing judge implicitly found Shark responsible for enough drugs to reach a base offense level of 37, resulting in a sentence of 360 months. However, Judge Sporkin never explicitly made a finding as to the amount. As Judge Sporkin never made an actual determination as to the amount by preponderance of the evidence, Shark has cause for his failure to make an *Apprendi*-like argument on appeal with regards to this issue.

The Court holds that Shark has demonstrated sufficient cause and prejudice regarding his failure to raise an *Apprendi*-like issue on appeal. As such, he is not procedurally barred from raising the issue on collateral review. The Court stresses that its holding with regards to cause is limited to the unique facts of this case. Had Shark not been sentenced as a career offender, the Court is confident that greater emphasis would have been placed on the actual amount of drugs Shark was responsible for.

### D.

The Court has determined that Shark is not procedurally barred from raising an *Apprendi* claim, and that *Apprendi* must be applied retroactively to this case. Consistent with those two holdings, the Court further concludes that since the jury never made any finding beyond reasonable doubt

as to drug quantity, Shark must be sentenced under the catchall provision of 21 U.S.C. § 841(b)(1)(C). Under that provision, Shark's statutory maximum sentence is 20 years.

Consistent with Part IIA of this discussion, the Court concludes that Shark must be sentenced as a career offender. The career offender provision itself provides the Court with the applicable base offense level and criminal history category. As Shark's statutory maximum sentence is "20 years or more, but less than 25 years," the corresponding base offense level is 32. As a career offender, Shark's criminal history category is VI. USSG § 4B1.1. The resulting guideline range is 210 to 262 months.

The Court recognizes that the maximum sentence of the guideline range exceeds the statutory maximum. However, the range is established under the career offender provision, which is based on prior convictions. Under *Apprendi* itself, prior convictions are an exception to the requirement that any fact which enhances the sentence beyond the statutory maximum must be found by the jury beyond a reasonable doubt. *Apprendi*, 530 U.S. at 490, 120 S.Ct. at 2362–63.[13] As the only enhancement applicable to this case is the career offender enhancement, the guideline range is not capped by the statutory maximum. Therefore, Shark will be resentenced within the guideline range of 210 to 262 months.

### CONCLUSION

For the reasons set forth in this memorandum, defendant's 2255 motion is granted in part and denied in part. Defendant's request for a new trial is denied. Defendant's request to be resentenced is

---

13. Although the Court must also find that Shark was at least 18 years old at the time of the instant offense of conviction in order to apply the career offender provision, the Court concludes that the defendant's age is not subject to the limits of *Apprendi*.

granted. Therefore, defendant's sentence is vacated and he shall be resentenced in accordance with this memorandum. An appropriate order accompanies this memorandum.