**Miguel TEJEDA, Jr., Petitioner,**

v.

**Larry E. DUBOIS, Respondent.**

**No. 97–1777.**

United States Court of Appeals, First Circuit.

Heard Jan. 7, 1998.

Decided April 24, 1998.

John M. Thompson, for petitioner.

Susanne G. Levsen, Assistant Attorney General, with whom Scott Harshbarger, Attorney General, was on brief for respondent.

Before STAHL, Circuit Judge, CYR, Senior Circuit Judge, and SHADUR,* Senior District Judge.

SHADUR, Senior District Judge.

Miguel Tejeda Jr. ("Tejeda") has filed a 28 U.S.C. § 2254 ("Section 2254") petition for a writ of habeas corpus ("Petition") that challenges his state court conviction on three related criminal charges. Tejeda contends that his conviction must be overturned because he did not receive constitutionally effective counsel at trial as required by the Sixth Amendment.[1] That claim was rejected by the district court, but for the reasons set forth below we reverse that decision, vacate Tejeda's conviction and remand the case for entry of an appropriate order.

### Background

Tejeda was arrested on July 11, 1991 and charged with trafficking in cocaine, unlawful possession of a firearm and unlawful possession of a firearm or ammunition without an identification card. Shortly thereafter he was indicted by a Hampden County, Massachusetts grand jury on those charges and was brought to trial in Hampden Superior Court. After Tejeda lost two motions to suppress evidence, the trial commenced on December 9, 1991.

At trial the prosecution relied on five police witnesses to build its case against Tejeda. What follows in the next three paragraphs is the officers' account of events, set out as factual narrative without stating the qualification that it reflects their testimony as the jury could be entitled to credit it.

On the date of Tejeda's arrest Sergeant Charles Cook ("Cook") had supervised police surveillance of a house at 37 James Street in Springfield, Massachusetts. Tejeda lived in an apartment on the first floor of the house. After Cook learned that the police had obtained a search warrant for the house (a warrant based on a tip provided by a confidential informant), Cook observed Tejeda leave the house, open the trunk of a car parked outside and lean inside the trunk. Tejeda then drove away in the car.

Cook followed Tejeda for a short distance and then radioed Detective John O'Mara ("O'Mara") to stop the car. O'Mara stopped Tejeda several blocks away and searched the car. O'Mara's partner, Detective Dennis Kirby ("Kirby"), found a plastic bag in the trunk that contained about 30 grams of white powder, which proved to be cocaine, and $366 on Tejeda's person. Kirby took Tejeda to the police station after conducting the search.

Shortly after the arrest, Cook and several other officers searched Tejeda's apartment. They found a loaded .38 caliber revolver under a mattress, ammunition for the gun, personal papers indicating that Tejeda lived in the apartment and a "drug ledger" containing names and addresses of prospective drug clients. Tejeda did not have the requisite identification card for the firearm and ammunition.

In the face of such testimony, Tejeda's defense lawyer Edelmiro Martínez, Jr. ("Martínez") concluded that Tejeda's only defense was to argue that the police had fabricated the case against Tejeda. Martínez began his defense by trying to expose inconsistencies in the police testimony during his cross-examinations, but his efforts were completely unavailing because the trial judge sustained numerous objections to Martínez' questions suggesting potential police fraud. Those rulings hampered Martínez' pursuit of that line of inquiry.

Martínez complained bitterly about the adverse rulings, arguing that they prevented him from presenting his defense. In response the judge harshly warned Martínez not to present a police fabrication defense supported only by Tejeda's word. Those contentious encounters generated an obvious hostility between Martínez and the judge that poisoned their relationship for the remainder of the trial. Martínez, incensed by

---

* Of the Northern District of Illinois, sitting by designation.

1.  As always, this opinion adheres to the conventional and convenient (though technically imprecise) practice of referring to the underlying Bill of Rights provision (which of course imposes limitations only on the federal government) rather than to the Fourteenth Amendment (which applies to state actors and has been construed to embody such Bill of Rights guarantees).

the judge's consistently unfavorable rulings, acted out his frustration by attacking the integrity of the judge. Martínez' petulance in turn antagonized the judge to the point that he fined Martínez $300 for contempt of court after one outburst.

That ongoing conflict discouraged Martínez' pursuit of the police-fabrication line of defense. He stopped trying to cross-examine prosecution witnesses on that subject and consequently failed to uncover significant inconsistencies that did exist in Cook's and O'Mara's testimony.

In the end, the only evidence of police fabrication that Martínez presented coherently came from Tejeda and one other defense witness. Tejeda vigorously denied having either drugs or a gun in his car or apartment. On the contrary, he testified that he was going in his car to pay some bills when he was stopped at gunpoint by the police. Tejeda contradicted O'Mara, stating that the car was not searched in Tejeda's presence. Instead Tejeda said that the police took him to the police station immediately and did not inform him of the charges against him until the next day. Tejeda stuck to his story during the prosecution's cross-examination, repeatedly insisting that the officers were lying.

Tejeda's only substantive defense witness, Alejandro Bonilla ("Bonilla"), claimed that he was Tejeda's roommate and that he never saw drug trafficking or the gun in their apartment.[2] But Bonilla's credibility was undermined when he admitted that he had provided a different home address to the police (in the course of a separate incident) two weeks before Tejeda's arrest.

Despite Martínez' frenetic attempts to elicit evidence of police fabrication, the trial judge concluded that there was no evidence to support the inference that the police were lying. Accordingly, he explicitly prohibited Martínez from arguing that theory in his closing statement. While Martínez did not adhere to that order with total strictness, his oblique references to potential police fabrication were scattered and unsupported by objective evidence of police misconduct.

Not surprisingly, Martínez' failure to argue fully what he had candidly admitted to be Tejeda's only line of defense resulted in guilty verdicts against his client. Tejeda was convicted on all three charges and sentenced to a state prison term of not less than five nor more than seven years.

After filing a timely notice of appeal, Tejeda moved for a new trial—a motion that was denied without a hearing. When he then appealed both his conviction and the denial of a new trial, new counsel was appointed to handle the appeals. Both his appeals were consolidated for hearing before the Massachusetts Appeals Court, and on February 18, 1994 the consolidated appeal was rejected (*Commonwealth v. Tejeda,* 36 Mass.App.Ct. 1105, 629 N.E.2d 370 (1994)). Tejeda's application to the Massachusetts Supreme Judicial Court for further appellate review was denied on March 29, 1994 (*Commonwealth v. Tejeda,* 417 Mass.1104, 634 N.E.2d 121 (1994)).

Undeterred, Tejeda filed a petition for federal habeas corpus relief on December 5, 1994. Then he alleged in an amended petition that he had received constitutionally ineffective assistance at trial from Martínez and that the trial judge had violated his right to counsel and due process by prohibiting Martínez from arguing the police fabrication theory in his closing argument.[3] On May 12, 1997 the district court issued a memorandum opinion denying both claims.

Tejeda then filed a Motion for Certificate of Appealability as to both claims. On July 23, 1997 the district court issued a certificate of appealability for Tejeda's ineffective assistance of counsel claim, but refused to grant a certificate for the restricted sum-

---

**2.** Tejeda's sister Miguelina also testified briefly for the defense, but she could not corroborate any detail of Tejeda's version of the facts.

**3.** Tejeda's original petition had also asserted that the trial judge's hostility towards Martínez de-

prived Tejeda of due process of law, but Tejeda elected to drop that claim after a magistrate judge ruled that he had not exhausted that claim in state court.

mation claim. This appeal resulted from the issuance of the certificate.[4]

## Standard of Review

As n.4 has indicated, Tejeda filed his federal habeas petition on December 5, 1994, well before the April 24, 1996 effective date of the Act's amendments to Section 2254. *Lindh v. Murphy,* —— U.S. ——, ——, 117 S.Ct. 2059, 2063, 138 L.Ed.2d 481 (1997) holds that the Act's more stringent limitations on the federal courts' review of state court determinations via habeas proceedings do not apply to petitions pending before the Act became law. Hence Tejeda is entitled to de novo review of his ineffective assistance of counsel claim (*Curtis v. Duval,* 124 F.3d 1, 4 (1st Cir.1997)).

## Ineffective–Assistance–of– Counsel Standards

Tejeda claims that Martínez' performance at trial was so deficient that it violated Tejeda's Sixth Amendment right to the effective assistance of counsel. To establish such a violation, *Strickland v. Washington,* 466 U.S. 668, 687–96, 104 S.Ct. 2052, 2064–69, 80 L.Ed.2d 674 (1984) requires that Tejeda show (1) that Martínez' performance fell below an objective standard of reasonableness and (2) that prejudice resulted.

In evaluating *Strickland*'s first component, we review Martínez' actions with the strong presumption "that, under the circumstances, the challenged action 'might be considered sound trial strategy'" (*id.* at 689, 104 S.Ct. at 2065, quoting *Michel v. Louisiana,* 350 U.S. 91, 101, 76 S.Ct. 158, 164, 100 L.Ed. 83 (1955)). Accordingly, Tejeda must show that "in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance" (*id.* at 690, 104 S.Ct. at 2066).

As for the second element—prejudice flowing from Martínez' substandard performance—Tejeda must demonstrate that there was a reasonable probability that but for Martínez' errors the outcome of the trial would have been different (*id.* at 694, 104 S.Ct. at 2068). For that purpose a reasonable probability is defined as "a probability sufficient to undermine confidence in the outcome" (*id.*). And in that respect our analysis is not limited to outcome determination—we must also contemplate "whether the result of the proceeding was fundamentally unfair or unreliable" (*Scarpa v. Dubois,* 38 F.3d 1, 16 (1st Cir.1994), quoting *Lockhart v. Fretwell,* 506 U.S. 364, 369, 113 S.Ct. 838, 842, 122 L.Ed.2d 180 (1993)). That consideration reflects the fact that at its root the right to effective counsel exists "in order to protect the fundamental right to a fair trial" (*Strickland,* 466 U.S. at 684, 104 S.Ct. at 2063).

## Application of the Standards

Tejeda contends that Martínez' performance at trial effectively deprived the jury of the chance to address his theory that the police fabricated the evidence against him. More specifically, Tejeda argues that Martínez' inflammatory statements and actions during trial led to a critical deterioration in the lawyer's relationship with the trial judge, and that the consequence of that mutual hostility between those two key players was that Martínez failed to provide more than a fragmentary and disjointed defense to the jury.

Our review of the trial transcript confirms that Martínez and the trial judge were like immiscible liquids: They simply could not tolerate each other. Their relationship began to break down from the moment that Martínez suggested in his opening statement that the police had fabricated evidence against Tejeda, and it ruptured completely when Martínez began to cross-examine pros-

---

4. Because Tejeda's habeas petition antedated the Antiterrorism and Effective Death Penalty Act of 1996 ("Act"), he should have applied instead for a certificate of probable cause, the pre-Act nomenclature under Section 2254. Although the older certificate of probable cause and the new certificate of appealability have identical substantive requirements, issuance of the former places the entire case before the Court of Appeals, while the latter specifies which issues satisfy the required "substantial showing" for appellate review (*Herrera v. United States,* 96 F.3d 1010, 1012 (7th Cir.1996); see *Byrd v. Henderson,* 119 F.3d 34, 36 n. 3 (D.C.Cir.1997)(per curiam) and other cases cited there). That distinction is not material here, because we resolve Tejeda's petition solely on the basis of his ineffective assistance of counsel claim.

ecution witnesses in ways that (if he had completed the line of inquiry) could have raised doubts about the veracity of the officers. Those fledgling attempts to raise the idea of police fabrication to the jury excited the wrath of the judge, who promptly sustained prosecutorial objections to Martínez' line of inquiry. Martínez responded to those adverse rulings by challenging the integrity of the judge and complaining that he was not being treated fairly. In turn, those attacks prompted the judge to chastise Martínez about his behavior and to question the propriety of the police fabrication defense itself.

One exchange that exemplifies the hostile dynamic between Martínez and the trial judge took place during Martínez' cross-examination of O'Mara, the first prosecution witness. Martínez asked O'Mara questions that implied that the officer had no reason to stop Tejeda's car when he did—in turn implying that O'Mara planted the evidence to cover his own mistake—but the judge sustained a series of objections that allowed O'Mara to avoid answering Martínez' questions. Martínez criticized those rulings, first asking "What kind of justice is that?" and then complaining "your [sic] limiting me, I can't ask any questions." Those attacks prompted the judge to demand that Martínez outline the evidence he thought supported his fabrication defense. When Martínez suggested that Tejeda's account alone would support an inference that the police were lying, the judge retorted "You better have something more than that." After characterizing Martínez' proffer as "absolutely outrageous," the judge warned Martínez "don't push me ... you overstep the bounds with me and you will know it." [5]

Martínez became incensed by the judge's attitude and frequent rulings against him.

He repeatedly protested that the judge was favoring the prosecution, even moving for a mistrial because "I can't ask any questions. [The prosecutor] can ask questions....I believe that I am not in the mood to continue this case this way." Martínez' remarks to the judge grew increasingly acerbic as the lawyer's mood blackened. Later rulings against Martínez prompted him to make snide comments such as "I believe that the best thing is for you to ask the jury to find him guilty and that's it," and "It seems everything I do is improper."

Martínez accompanied his acrimonious commentary with outward displays of anger. Parsing the trial transcript (a paper record that cannot reproduce Martínez' hostile tone, manner and body language, although those things plainly emerge from the disputants' statements) reveals numerous occasions when Martínez had to be told to lower his voice or to refrain from shouting, including one instance where the judge exasperatedly asked that the record reflect the fact that Martínez was yelling. Nor was Martínez' misconduct limited to the tone of his voice. After one adverse ruling the judge remonstrated Martínez, saying "I'm sick and tired of you prancing around here, making all kinds of facial expressions, raising your arms, throwing your papers."

Predictably, Martínez' comments and behavior further antagonized the trial judge, whose loss of all patience with Martínez' attitude was evidenced by the $300 contempt fine. More importantly, the judge's tolerance for the fabrication defense dwindled as well. By the end of the trial the judge began to dismiss Martínez' police perjury arguments with out-of-hand comments like "Mr.

---

5. Those comments—which really applied a preconceived notion of credibility to take that determination from the jury—reflect the trial judge's dislike of the police fabrication defense as such. It is surely worth noting that the same judge's comparable display of overt hostility toward another defense counsel's attempt to use the same defense caused the Supreme Judicial Court of Massachusetts in *Commonwealth v. Murchison,* 418 Mass. 58, 634 N.E.2d 561 (1994) to overturn a conviction because of the strong likelihood that the judge's comments had prejudiced the jury. And parenthetically, one of the prosecution's police witnesses as to whom the same judge gave an impermissibly pro-police-biased instruction to the jury in *Murchison* was identified as Springfield, Massachusetts Officer John O'Mara (*id.* at 564 n. 2)—presumably the same person as Springfield Detective John O'Mara, one of the police witnesses whose testimony in Tejeda's case the same judge would not permit to be the target of a police fabrication defense advanced by Martínez.

Martínez, argue with your brain" and "Don't insult my intelligence." [6]

There is no question that the disintegration of the relationship between the trial judge and Martínez had a corrosive effect on the presentation of Tejeda's fabrication defense to the jury. Martínez stopped trying to corroborate Tejeda's testimony through cross-examination of the police witnesses, instead devoting his energy to expressing his displeasure with the judge's rulings. As a result Martínez failed to make effective use of such internal inconsistencies in the officers' testimony as these:

1. Cook included the cocaine and money in his search warrant return for the apartment, despite the fact that Kirby testified at trial that both items were found instead in the search of Tejeda's car.

2. Cook testified at trial that the police found a drug ledger in Tejeda's apartment, but Cook had made no mention of any such ledger in either his search warrant return or in his grand jury testimony.

3. Cook's grand jury testimony and the police arrest report placed the location of Tejeda's arrest at three different street intersections (including one non-existent address).

To be sure, each of those differences (and one or two other matters that we do not itemize) might be viewed instead as reflecting sloppy police work, and the prosecutor would have been entitled to urge that in closing argument to the jury. But Tejeda too was entitled to have his lawyer urge to the jury that the discrepancies supported the graver conclusion of police misconduct. Defense counsel's argument drawing that inference from the evidence could have lent critical support to Tejeda's otherwise unsubstantiated version of the facts.

■ Tejeda's cause also suffered as the trial judge's contempt for Martínez and the fabrication defense grew. By the end of the trial, the judge mocked Martínez' attempts to use police fabrication arguments. One manifestation of that disdain was the judge's conclusion that the "facts" presented at trial left "no reasonable inference that the police fabricated any of the stories that they testified to on the stand." [7] That led the judge explicitly to forbid Martínez from arguing in his closing statement that the police had planted evidence or were otherwise lying on the stand.

Thus hampered by the judge's warning (which was backed up by the judge's oft-demonstrated willingness to sustain objections to Martínez' advocacy), Martínez' final presentation of the fabrication defense in his closing statement was neither coherent nor complete. In addition, Martínez' earlier failure to expose any chinks in the police version of the facts left him with almost no ammunition at the close. As a result, his fabrication argument depended heavily on Tejeda's testimony and on the naked assertion that policemen sometimes lie in order to win cases. Not surprisingly, that impotent presentation of Tejeda's position fell short of raising a reasonable doubt as to Tejeda's guilt in the minds of the jury.

■ Our extensive review of the trial transcript places us, in cause-and-effect terms, in much the same position as a basketball referee who sees a player throw an elbow at an adversary but cannot tell if the blow was the initial foul or a retaliatory strike. Both Martínez and the trial judge clearly provoked

---

6. We should not be misunderstood as suggesting that the judge prejudiced the jury with those (or many of the other) negative comments, because virtually all of the infighting between the judge and Martínez took place at bench conferences, presumably outside of the hearing of the jury (although Martínez' propensity to shout might raise at least some doubt as to that assumption). We focus only on the effect that the acrimonious exchanges had on Martínez' performance before the jury.

7. That conclusion was clearly erroneous under Massachusetts law. As *Murchison*, 634 N.E.2d at 563 quoted from *United States v. Molina*, 934 F.2d 1440, 1445 (9th Cir.1991):

> In a case that essentially reduces to which of two conflicting stories is true, it may be reasonable to infer, and hence to argue, that one of the two sides is lying.

Thus Tejeda's testimony alone would have allowed Martínez to challenge the credibility of the police in his closing argument. But we stress that here we are applying the federal constitutional standard, not simply a doctrine of state law.

each other, making it difficult to unravel whether Martínez' petulance or the trial judge's hostility first poisoned their relationship and consequently made it impossible for Martínez to present Tejeda's fabrication defense.

But unlike the basketball referee, we have no need to decide whether to assess a single foul or a double foul. Instead our constitutional focus is on defendant Tejeda—and he lost regardless of which of the combatants initiated contact. Either way, Tejeda was deprived of his chance to present an effective fabrication defense to the jury.

It is thus unnecessary for us to attempt to divide the blame between lawyer and judge. What matters is that lawyer Martínez failed to present Tejeda's primary line of defense to either the judge or the jury. It is not an answer to observe that the trial judge's own actions appeared to contribute to that failure. Martínez' anger over the judge's rulings and attitude simply prevented him from serving his client's interests. That cannot be characterized as trial strategy. In sum, Martínez' representation was so deficient that it falls below even the minimal standard for professionally competent assistance established by *Strickland* and its progeny, and it thus satisfies the first half of the *Strickland* test.

In terms of the second branch of the *Strickland* analysis, it is impossible to conclude at any level of certainty whether, but for Martínez' conduct, the jury would have decided that there was enough evidence of police fabrication to raise a reasonable doubt as to Tejeda's guilt. Martínez' failure to present a coherent argument on that score took the question away from the jury and deprived Tejeda of his only defense.[8] Depriving a criminal defendant of his only viable defense certainly renders the resultant trial "fundamentally unfair or unreliable" as demanded by *Lockhart*. Hence Martínez' inadequate performance created sufficient prejudice to satisfy *Strickland*'s second requirement as well, and his habeas petition must be granted.

*Conclusion*

Tejeda has demonstrated that Martínez' performance failed to satisfy any objective standard of reasonableness and that Tejeda suffered prejudice from that substandard performance. That being the case, Tejeda was deprived of his constitutional right to effective assistance of counsel during his trial. That renders it unnecessary to address Tejeda's added claim based on an allegedly restricted summation by Martínez.

In terms of the appropriate remedy, the present record—necessarily limited as it is to matters bearing on the issues addressed in our opinion—provides no information as to such questions as when Tejeda actually began to serve his five to seven year sentence and, thus, what his anticipated out date is (giving effect (1) to time spent in custody before the sentence itself commenced and (2) to any good time credits Tejeda has earned while in custody). Because the nature of Tejeda's constitutional deprivation was the absence of effective representation by counsel rather than some incurable flaw, the usual relief granted to a successful habeas petitioner such as Tejeda would be to give the Commonwealth the choice of affording him a prompt new trial or releasing him. But in this instance the district judge is in the best position on remand to determine the most appropriate relief. That may include a determination of what time period would be required for the appropriate scheduling of a new trial, taking into account both the reasonable preparation needs of the prosecution and (more critically) the time needed for new defense counsel to start from scratch and to prepare an effective defense. It may also be relevant for the district judge to consider whether balancing (1) the timetable referred to in the preceding sentence against (2) the time of Tejeda's presumptive release from custody as things now stand might call for a straightforward order of his current release, rather than affording the Commonwealth the more common alternative described earlier in this paragraph.

---

8. As noted earlier, Martínez told the judge several times that the police fabrication theory was the only defense Tejeda had. Our review of the record provides no reason to question that assessment of Tejeda's potential lines of defense.

We therefore REVERSE the district judge's order, VACATE Tejeda's conviction and REMAND for further proceedings consistent with this opinion.