DANIEL R. DOMINGUEZ, Senior United States District Judge
Pending before the Court are the following motions: (a) Petitioner Lenisse Aponte-Aponte's ("Petitioner" or "Aponte-Aponte") Motion under 28 U.S.C. § 2255 to vacate, set aside, or correct his sentence in Criminal Case No. 12-931 (DRD) (D.E. 1 );[1] (b) Petitioner's Amended Motion under Section 2255 (D.E. 7); (c) the United States of America's ("Respondent") Responses in opposition (D.E. 3 and D.E. 13); Petitioner's Reply to Respondent's first Response in opposition (D.E. 4). For the reasons set forth below, Petitioner Lenisse Aponte-Aponte's Motion and Amended Motion under 28 U.S.C. § 2255 are DENIED.
I. BACKGROUND
On December 17, 2012, Aponte-Aponte and three other co-defendants were charged in a two count Indictment (Crim. No. 12-931 (DRD), D.E. 31). Aponte-Aponte was charged in both counts (Crim. No. 12-931 (DRD), D.E. 31). On February 8, 2015, Aponte-Aponte pled guilty to Count One (1) of the Indictment which charged that on or about November 30, 2012, in the District of Puerto Rico and elsewhere within the jurisdiction of this Court, defendant [4] Lenisse Aponte and three other co-defendants, aiding and abetting each other, with the intent to cause death and serious bodily harm, did knowingly, willfully and intentionally take a motor vehicle, that is, a Toyota Matrix, bearing license plate number FRT-734, that had been transported, shipped or received in interstate and foreign commerce, from the person of Jose E. Gomez-Saladin, by force, violence, and intimidation by sticking him on the head, and in perpetration of said offense caused his death, in violation of Title 18, United States Code, Sections 2 and 2119(3) (Crim. No. 12-931 (DRD), D.E. 347).
The Plea Agreement, filed on that same day, stipulated for a base offense level of forty-three (43) pursuant to the United States Sentencing Guidelines (U.S.S.G.) § 2B3.1, a two (2) level downward adjustment pursuant to U.S.S.G. § 3B1.2(b), and a three (3) level reduction for acceptance of responsibility pursuant to § 3E1.1(a) and (b) (Crim. No. 12-931 (DRD), D.E. 347 at p. 3). The stipulated sentencing calculations placed Aponte-Aponte's adjusted offense level at 38, with a guideline imprisonment range of 235 to 293 months, assuming a Criminal History Category (CHC) of I; there was no stipulation as to the CHC (Crim. No. 12-931 (DRD), D.E.
*174 347 at p. 3). The Plea Agreement included a waiver of appeal providing that defendant would surrender her right to appeal the judgement and sentence if the Court accepted the Plea Agreement and sentenced her within the advisory guideline range of 235-293 months or a more lenient sentence (Crim. No. 12-931 (DRD), D.E. 347 at p. 6). Aponte-Aponte did not object to the presentence investigation report (PSR) (Crim. No. 12-931 (DRD), D.E. 388).
On June 2, 2015, Aponte-Aponte was sentenced to a term of imprisonment of 293 months, followed by five (5) years of supervised release, and a special monetary assessment of $ 100.00 (Crim. No. 12-931 (DRD), D.E. 388). Judgment was entered on that same day (Crim. No. 12-931 (DRD), D.E. 389). Aponte-Aponte did not file a direct appeal of her sentence. See (Crim. No. 12-931 (DRD) ).
On January 29, 2016, Aponte-Aponte filed, pro se, a Motion under section pro se Motion under 28 U.S.C. § 2255 to vacate, set aside, or correct his sentence in Criminal Case No. 12-931 (DRD) (D.E. 1 ) and on April 10, 2017, she filed an Amended Motion under Section 2255 (D.E. 7). On March 3, 2016, Respondent filed a Response in opposition to Petitioner's first Motion under Section 2255 (D.E. 3), and on March 26, 2016, Petitioner replied it (D.E. 4). On March 15, 2019, Respondent filed a Response to Petitioner's Amended Section 2255 Motion (D.E. 13).
II. DISCUSSION
In her § 2255 Petition and Amended Petition, Aponte-Aponte raised the following allegations of ineffective assistance of counsel:
(1) counsel failed to explain to her the sentencing table and the PSR (D.E. 1 and D.E. 7);
(2) counsel failed to explain to her the charges, the plea agreement, and the consequences of a guilty plea (D.E. 1 and D.E. 7);
(3) counsel failed to provide her information on the right to a jury trial (D.E. 1);
(4) counsel failed to challenge the co-defendants' statements (D.E. 7);
(5) counsel failed to file a notice of appeal and/or appeal of her conviction (D.E. 1 and D.E. 7);
A. Ineffective Assistance of Counsel Standard
The standard for an ineffective assistance of counsel claim is whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result. Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) ; Lema v. United States, 987 F.2d 48 (1st Cir. 1993). To succeed in a claim of ineffective assistance of counsel, Petitioner must show both incompetence and prejudice: (1) petitioner must show that counsel's representation fell below an objective standard of reasonableness, and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. Argencourt v. United States, 78 F.3d 14 (1st Cir. 1996) ; Darden v. Wainwright, 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986) ; Lockhart v. Fretwell, 506 U.S. 364, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993).
Petitioner bears a "very heavy burden" in his/her attempt to have his sentence vacated premised on an ineffective assistance of counsel claim. Argencourt v. United States, 78 F.3d 14, 16 (1st Cir. 1996) ; Lema v. United States, 987 F.2d 48, 51 (1st Cir. 1993). Even more so under the Strickland standard, where ineffective assistance *175 occurs "only where, given facts known at the time, counsel's choice was so patently unreasonable that no competent attorney would have made it." United States v. Rodriguez, 675 F.3d 48, 56 (1st Cir. 2012), quoting Tevlin v. Spencer, 621 F.3d 59, 66 (1st Cir. 2010), which in turn quotes Knight v. Spencer, 447 F.3d 6, 15 (1st Cir. 2006).
In order to successfully satisfy the first prong of the Strickland test, petitioner must show that "in light of all the circumstances, the identified acts or omissions [allegedly made by his counsel] were outside the wide range of professionally competent assistance." Tejeda v. Dubois, 142 F.3d 18, 22 (1st Cir. 1998) (citing Strickland, 466 U.S. at 690, 104 S.Ct. 2052 ). Petitioner must overcome the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Smullen v. United States, 94 F.3d 20, 23 (1st Cir. 1996) (citing Strickland at 689, 104 S.Ct. 2052 ). Finally, a court must review counsel's actions deferentially, and should make every effort "to eliminate the distorting effects of hindsight." Argencourt v. United States, 78 F.3d at 16 (citing Strickland, 466 U.S. at 689, 104 S.Ct. 2052 ).
The second prong of the Strickland test, the element of prejudice, also sets the bar high. "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." Argencourt v. United States, 78 F.3d at 16 (citing Strickland, 466 U.S. at 691, 104 S.Ct. 2052 ). Petitioner must "prove that there is a reasonable probability that, but for his counsel's errors, the result of the proceeding would have been different." Knight v. United States, 37 F.3d 769, 774 (1st Cir.1994) (citing Strickland, 466 U.S. at 687, 104 S.Ct. 2052 ).
The above standards mean petitioner should be successful in showing deficiencies in his/her counsel's representation, he/she then must conclusively establish that those deficiencies led to a real prejudice against him/her in the criminal proceedings. Id. at 694, 104 S.Ct. 2052. Petitioner Aponte-Aponte has failed to meet the Strickland standard in all of her claims.
(1) Counsel was ineffective for failing to explain to her the sentencing table and the PSR.
Petitioner alleges that she had not understood her sentence because counsel failed to explain to her the sentencing table and the Pre-Sentence Report (PSR) (D.E 1 at p. 5, and D.E. 7 at p. 5). Petitioner provides no further arguments as to this matter. The record contradicts Petitioner's contentions that her counsel failed to explain the sentencing table and the PSR.
A review of the Plea Agreement filed with and accepted by the Court[2] states the following terms and conditions: (1) count to which defendant plead guilty; (2) maximum penalties[3] ; (3) special monetary assessment; (4) fines and/or restitution; (5) rule 11(c)(1) warnings[4] ; (5)[5] advisory *176 nature of the sentencing guidelines[6] ; (6) sentencing guideline calculations[7] ; (7) specific sentence recommendation[8] ; (8) no further adjustment or departures; (9) no stipulation as to criminal history category; (10) dismissal of remaining counts; (11) satisfaction with counsel; (12) rights surrendered by defendant through guilty plea; (13) statement of facts; (14) limitations of plea agreement; (15) entirety of plea agreement; (16) amendments to plea agreement; (17) waiver of appeal; and (18) voluntariness of guilty plea (Crim. No. 12-931 (DRD), D.E. 345). A close review of the wording of the terms and conditions of the Plea Agreement shows that Petitioner's Sentencing Guidelines calculations were clearly expressed. In addition, the Plea Agreement distinctly stated that Petitioner was aware of the advisory nature of the Sentencing Guidelines (Id. at p 3).
A review of the transcript of the change of plea hearing, establishes that the Court repeatedly asked Aponte-Aponte if she understood the terms of the Plea Agreement. Petitioner clearly indicated that she understood them.
THE COURT : Now I go to Ms. Aponte. Ms. Aponte, do you understand the terms of the agreement?
MS. APONTE-APONTE : Yes.
THE COURT : Are those the terms of the agreement with the government as you understand them?
MS. APONTE-APONTE : Yes.
THE COURT : Your plea agreement is different from hers. In your plea agreement you start off at 43, two points are deducted pursuant to the agreement because you are considered by the government and your counsel a minor participant, and three points are also subtracted for your acceptance of responsibility. So you end up at 38, your sentence is potentially between 235 and 293 months. Do you understand that?
MS. APONTE-APONTE : Yes.
THE COURT : All right. I ask you, are those the terms of the agreement as you understand them?
MS. APONTE-APONTE : Yes.
*177 (Crim. No. 12-931 (DRD), D.E. 416 at pp. 22, 23).
At the plea hearing, the Court also asked Petitioner if she had talked to her lawyer about the Sentencing Commission advisory guidelines. Petitioner specifically acknowledged that she had talked to her attorney in relation to the Sentencing Guidelines that would apply to her case.
THE COURT: Now, under the Sentencing Reform Act the United States Sentencing Commission has issued advisory guidelines -- they are not mandatory -- for judges to follow in determining the sentence in a criminal case. Have both of you talked to your lawyers about the Sentencing Commission advisory guidelines that apply to each one of your cases? Ms. Berrios?
MS. BERRIOS-COTTO : Yes.
THE COURT : Ms. Aponte?
MS. APONTE-APONTE : Yes.
(Crim. No. 12-931 (DRD), D.E. 416 at pp. 26, 27). (emphasis ours)
Furthermore, the Court made sure that Petitioner understood that the court would not be able to determine the advisory guideline sentence for her case until after the presentence report had been completed, and that the sentence imposed could he higher, up to life, or lower. The Court explained to Petitioner that in order to determine a proper sentence, it would examine, concurrently with the guidelines, the criteria under the law. The Court carefully distinguished that there were two kinds of sentences: a sentence under the guidelines, and a potential sentence under the law.[9]
THE COURT : Do you understand that the Court will not be able to determine the advisory guideline sentence for your case until after the presentence report has been completed and you and the government have had an opportunity to challenge the facts reported by the probation officer?
THE INTERPRETER : Yes as to both.
THE COURT : Do you understand that the sentence imposed can be different, higher or lower, up to life in this case? Ms. Aponte?
MS. APONTE-APONTE : Yes.
THE COURT : Ms. Berrios?
MS. BERRIOS-COTTO : Yes.
THE COURT : So in order for the Court to determine a proper sentence of the Court, the Court must review and starts off at the advisory guidelines. After that, the Court examines -- concurrently with that figure, the potential guidelines, the Court examines the criteria under the law. The Court is looking for a sentence that insufficient [sic] [sufficient] but not greater than necessary, and it is an individual sentence as to each one of you. Do you understand that, Ms. Aponte?
MS. APONTE-APONTE : Yes.
THE COURT : Ms. Berrios?
MS. BERRIOS-COTTO : Yes.
THE COURT : These are the factors that I will be looking at in addition to the guidelines and in concurrency with them. They are factors under the law. One, the nature and circumstance of this offense and the history and characteristics of each one of you. Do you understand that?
THE INTERPRETER : Yes as to both.
*178 THE COURT : That the sentence that the Court may impose reflects the seriousness of the offense, that it promotes respect for the law, and that it provides just punishment for the offense, that it affords adequate deterrence to criminal conduct, that it protects the public from further crimes of the defendant, that it provides a defendant with the needed educational or vocational training, medical care or other correctional treatment in the most effective manner, that the Court must review the two kinds of sentences: One is the sentence under the guidelines, the other is the potential sentence under the law. And the law in this particular case is from a number of years up to life, and the potential guidelines you both have heard them. Do you understand that, Ms. Aponte?
MS. APONTE-APONTE : Yes.
(Crim. No. 12-931 (DRD), D.E. 416 at pp. 26-29) (emphasis ours)
A review of the transcript of Petitioner's sentencing hearing establishes that the Court asked Aponte-Aponte directly as to her PSR. Petitioner indicated to the Court that counsel had translated and explained the presentence report, and answered all of her questions. At no time during the sentencing hearing, Petitioner gave any indication that she did not understood the PSR.
THE COURT: Yes, we are at level 38. That's where we're at. We're at level 38 and there is no argument about that.
So has the presentence report been duly translated and explained to defendant?
MS. BRILL: Yes, Your Honor.
THE COURT : All right. And if she had any questions, did you attend to them?
MS. BRILL : Yes, Your Honor.
THE COURT : OKAY. Do you understand that you duly covered any questions that she may have had?
MS. BRILL : Yes, Your Honor.
THE COURT: Okay. Miss Lenisse Aponte-Aponte, you lawyer, Miss Rachel Brill has advised the Court that the presentence report has been duly translated to you, and that if you had any questions they were duly attended by Ms. Brill. And I ask you then, is she, Miss. Brill, making a correct representation to the Court?
THE DEFENDANT : Yes.
(Crim. No. 12-931 (DRD), D.E. 417 at pp. 2,3).
At the Sentencing Hearing, the Court carefully explained to Aponte-Aponte its decision to sentence her to a term of 293 months, which was the highest end of the guidelines.
THE COURT :
...
The Court has reviewed the advisory guideline calculations and finds that the presentence investigation report has adequately applied the guideline computations and that they satisfactorily reflect the components of this offense by considering its nature and circumstances.
The Court will consider the seriousness of this offense, the need to promote respect for the law, as well as all other factors contemplated under Title 18, United States Code, Section 3553.
Before the Court is a 27-year-old female with no dependents, a high school equivalency diploma. She indicated having tried to commit suicides on two occasions and today I heard of a third occasion.
The Court first considers defendant's role in the offense, as well as the violent nature of the offense, the undue cruelty involved in the suffering lived by the victim who was burned to death, prior to being submitted by beatings of two of the co-defendants.
*179 The Court, however, notes that the defendant was the person who stopped the vehicle. She's a female. She's young. She had an apparent necessity to stop a vehicle and proceed to achieve illegally money from the person. So she has that also added role in stopping the vehicle.
Some say -- some defendants say that she prior knew him. She has not accepted that. In fact, she denied that. However, the Court also notes that she could have stepped away from this crime on at least two occasions: Number one, when they got the most money they could from the victim, which was only $ 20. Then, when she states that she was not in agreement with the plan, she could have then said well, I'm not going to be any part of this. I'm going to step down. She had those important facts and those important decisions to be made when she knew definitely that, particularly the last time, this looked like a murder.
The Court also recognizes that this defendant had a very, very rough, traumatic childhood. She was beaten by her father-in-law, sexually abused, and raped. She also had a tough life with her companion who also beat her. She also was apparently beaten by persons from the street in at least, according to the memorandum, in at least seven times in the period of three years, which is corroborated by the record. She also suffers from a deficiency, a learning deficiency, which was explained. However, this conduct is not a license to murder somebody.
So, balancing all the factors, it is the judgment of this Court that the defendant is hereby committed to the custody of the Bureau of Prisons for a term of 293 months, which is the higher -- the highest end of the guidelines.
...
(Crim. No. 12-931 (DRD), D.E. 417 at pp. 32-34).
The record does not support Petitioner's allegation that she did not understood her sentence because her counsel failed to explain the sentencing table and the PSR. Moreover, the record reflects that not only was Aponte-Aponte advised by counsel as to these matters, but she was also thoroughly advised by the Court.
The Petitioner, Ms. Aponte-Aponte, of course, forgot to mention that there was a murder executed within the conspiracy which she accepted expressly.
THE COURT : Now we go to the facts as to Ms. Aponte-Aponte.
MS. MECONIATES : Yes, Your Honor. On or about November 30, 2012, Ruben Delgado-Ortíz, Edwin Torres-Osorio, Alejandra Berrios-Cotto, and Lenisse Aponte-Aponte aiding and abetting each other, with the intent to cause death or serious bodily harm, did knowingly, willfully, and intentionally take a Toyota Matrix bearing license plate No. FRT-347 that had been transported, shipped, or received in interstate and foreign commerce from the person of José E. Gómez-Saladín by force, violence intimidation and in the perpetration of said offense caused his death. Specifically, on November 29, 2012, Delgado-Ortíz, Torres-Osorio, Berrios-Cotto, and Aponte-Aponte devised a scheme to rob a victim because Aponte-Aponte did not have enough money to pay her rent. As part of the scheme, Berrios-Cotto and Aponte-Aponte would lure a victim and then Delgado-Ortíz and Torres-Osorio would approach the victim regarding a fictitious debt Aponte-Aponte owed Delgado-Ortíz in the hopes --
THE INTERPRETER : Please a little slower.
MS. MECONIATES : Oh, I'm sorry. -- in the hopes the victim would satisfy the *180 fictitious debt. Later that night the four co-defendants made their way to Padial Street. A blue Toyota Matrix that was transported, shipped, or received in interstate and foreign commerce stopped nearby and ... Aponte-Aponte gave Delgado-Ortíz and Torres-Osorio the signal to approach the car and execute the plan [that resulted in the murder of the victim by setting him on fire with gasoline doused on the victim. The four codefendants were present when the defendant Aponte-Aponte was burned and when they purchased more gasoline to burn the car where they had placed the victim]. Delgado-Ortíz and Torres-Osorio entered the car and Delgado-Ortíz told Aponte-Aponte she had to give him the money she owed him. Delgado-Ortíz had pepper spray in his pocket and used it to simulate the presence of a weapon. The driver, later identified as José E. Gómez-Saladín, eventually drove to an ATM machine where he, accompanied by Delgado-Ortíz, withdrew $ 400 and gave it to Delgado-Ortíz. The group later drove towards Savarona and discussed Gómez-Saladín's fate since he had seen their face and could identified them. Eventually the group went to a gas station and purchased gas. By this time Delgado-Ortíz forced Gómez-Saladín to stop driving the car. Delgado-Ortíz then drove the Toyota Matrix to an old abandoned prison in Guavate. There he parked the car and everyone got out Delgado-Ortíz and Berrios-Cotto escorted Gómez-Saladín from the car and told him to kneel. They doused him with gasoline and lit him on fire. Gómez-Saladín began yelling and got up and started to run. He stripped off his pants before tripping on a mound of garbage that was at the scene. Delgado-Ortíz and Berrios-Cotto followed Gómez-Saladín and began hitting him with sticks and tubing they found in the area. They beat Gómez-Saladín until he was barely breathing. The four co-defendants gathered the sticks and tubing used to beat Gómez-Saladín, placed them in the car and left the prison [at Guavate] [and] the [Toyota] Matrix. Delgado Ortíz then drove to another gas station and they purchased more gasoline in order to burn the Toyota Matrix. They proceeded towards La Macanea Road. There they exited the car and Torres-Osorio poured gas over the seats and the dashboard. He then set the car on fire.
...
MS. BRILL : Ms. Aponte-Aponte, Your Honor.
THE COURT : Excuse me. Ms. Aponte-Aponte, now that you have heard the government's version of facts through the interpreter, do you agree with the government's version of facts?
MS. APONTE-APONTE : Yes.
THE COURT : Okay. Before continuing, please -- I'm going to provide you the original of your plea agreements. Please examine the plea agreements and confirm to the Court that you have initialed each page and that you have signed the plea agreement, the plea agreement supplement, and also the government's version of facts.
(Crim. No. 12-931 (DRD), D.E. 416 at pp. 41-44).
Therefore, the Court finds that Petitioner's claim of ineffective assistance of counsel for failure to explain the sentencing table and the PSR is meritless for being contrary to the record and the same is DENIED.
(2) Counsel was ineffective for failing to explain the charges, the guilty plea, and the consequences of a guilty plea.
Aponte-Aponte alleges in her first § 2255 Motion that her plea was involuntary *181 because she pled guilty without understanding the consequences of the guilty plea (D.E. 1 at p. 8). In her § 2255 Amended Motion, she expanded on her claim that her plea was involuntary by alleging that she did not understand the charges against her, and that the plea agreement was not explained to her (D.E. 7 at p. 6). Petitioner provides no further arguments as to these allegations.
Contrary to Petitioner's allegations, the record reflects that Aponte-Aponte's entry into the plea agreement was both knowing and voluntary. At the change of plea hearing, the record shows that Aponte-Aponte discussed the charges with her attorney, that her attorney explained the case to her, and that she was satisfied with her attorney's services.
THE COURT: All right, okay. Now we go back to Ms. Aponte. Ms. Aponte, what is the name of your attorney?
MS. APONTE-APONTE : Rachel Brill.
THE COURT : Are you satisfied with Ms. Brill's services, representation, and advice?
MS. APONTE-APONTE : Yes.
THE COURT : Have you had time to consult with your attorney as to the case in general to your full satisfaction?
MS. APONTE-APONTE : Yes.
THE COURT : We're going to have to - would you put the microphone next to her. Thank you. Have you been furnished with a copy of the indictment containing the charges against you? with your attorney?
MS. APONTE-APONTE : Yes.
THE COURT : Have you discussed with Ms. Brill the discovery that she has received relating to your case?
MS. APONTE-APONTE : Yes.
THE COURT : Has your attorney explained to you all about the case and discussed the discovery with you to your full satisfaction?
MS. APONTE-APONTE : Yes.
(Crim. No. 12-931(DRD), D.E. 416 pp. 14-15).
During the change of plea hearing, the Court carefully questioned Aponte-Aponte regarding her knowledge of the terms of the plea agreement.
THE COURT : ... Before the Court accepts your plea, and this is an individual plea notwithstanding that we're taking them together, each one has a different plea agreement as to the consequences under the guidelines. So, before the Court accepts your plea, there are a number of questions that the Court will ask to ensure that you are about to enter into a valid plea. Do you understand that, Ms. Berrios-Cotto?
MS. BERRIOS-COTTO : Yes.
THE COURT: And Ms. Aponte-Aponte?
MS. APONTE-APONTE : Yes, Your Honor.
(Crim. No. 12-931 (DRD), D.E. 416 at p. 6).
Aponte-Aponte represented to the Court that she understood the terms of the plea agreement, that she was not threatened, and that she had discussed with her attorney the consequences of entering a guilty plea.
THE COURT: Have you discussed with your attorney about the potential consequences of making a plea?
MS. APONTE-APONTE : Yes.
THE COURT: How many times have you met with your attorney to discuss the case in general? Forget about the plea. Let's talk about the case in general. How many times did you meet with her from the time you were indicted or from the time she came on until the plea? It doesn't have to be an exact number.
*182 MS. APONTE-APONTE : More than ten times.
THE COURT : And, Ms. Brill, is she correct?
MS. BRILL: Yes, Your Honor.
THE COURT : Okay. And how many times have you met with her to discuss the consequences of making a plea?
MS. APONTE-APONTE: Three to four times.
...
THE COURT : All right. I ask you, are those the terms of the agreement as you understand them?
MS. APONTE-APONTE : Yes.
THE COURT : All right. I ask you, are those the terms of the agreement as you understand them?[10]
MS. APONTE-APONTE : Yes.
THE COURT : Has anyone made other or different promise or assurance to you of any kind in an effort to induce you to enter into a plea of guilty in this case?
MS. APONTE-APONTE : No.
THE COURT : Have you been threatened and/or coerced to enter a plea?
MS. APONTE-APONTE : No.
THE COURT : Has anyone -- all right. Do you understand that if your plea is accepted in this particular case that you will be bound by this plea as far as your acceptance of responsibility?
MS. APONTE-APONTE : Yes.
...
THE COURT : Do you both understand that the adjudication of guilt may deprive you of valuable civil rights such as the right to hold a public office, the right to serve on a jury, and the right to possess any kind of firearms?
THE INTERPRETER : Yes as to both.
THE COURT : Okay.
(Crim. No. 12-931 (DRD), D.E. 416 at pp. 15-16, 24-25).
The Court concluded that Aponte-Aponte Knowingly and voluntarily entered into the plea agreement.
THE COURT : How do you plea to the charges, Ms. Aponte-Aponte? Guilty or not guilty?
MS. APONTE-APONTE : Guilty.
THE COURT : Therefore, it is the finding of the Court in the case of United States of America versus Lenisse Aponte-Aponte, also known as Prieta, Criminal No. 12-931, that the defendant is fully competent and capable of entering an informed plea and that her plea of guilty is a knowing, voluntary and intelligent plea, supported by an independent basis of fact containing each of the essential elements of the offense. Her plea is therefore accepted, and she is now adjudged guilty of that offense.
(Crim. No. 12-931 (DRD), D.E. 416 at p. 48).
The record, however, clearly contradicts Petitioner's allegations that she did not understand the charges against her, that the plea agreement was not explained to her in person, that she did not understand the plea agreement, and that she pled guilty without understanding the consequences of the guilty plea[11] . Consequently, the Court finds that Petitioner made a *183 knowingly and voluntary plea, and her claim of ineffective assistance of counsel on this regard is meritless and the same is DENIED.
(3) Counsel was ineffective for failing to provide her information on her right to a jury trial .
Petitioner alleges that defense counsel failed to inform her about the right to jury trial (D.E. 1 at p. 6). Petitioner provides no further arguments as to this matter.
The record contradicts Petitioner's contention that defense counsel did not inform her about her right to jury trial. As discussed above, at the change of plea hearing, Aponte-Aponte answered affirmatively when asked in open court if she understood that the adjudication of guilt may deprive her of valuable civil rights such as the right to hold a public office, the right to serve on a jury, and the right to possess any kind of firearms? In addition, the Plea Agreement clearly enumerated all the rights surrendered by a defendant when entering a guilty plea. See (Crim. No. 12-931, D.E. 345 at p. 4-5 par. 12). At the change of plea hearing, defense counsel stated in open court that she had translated the plea agreement to Aponte-Aponte in the Spanish language in a couple of occasions to ensure that she had knowledge of all its the terms and consequences.
THE COURT: Please advise the Court what you have done in order to make sure that she has knowledge of all the terms and consequences thereof in this plea agreement.
MS. BRILL : Your Honor, all of my conversations with Ms. Aponte have been in Spanish, and in particular I have translated the entire plea agreement version of facts and plea supplement to her in the Spanish language on a couple of occasions.
THE COURT : And what is -- well, before that, have you translated this plea agreement to her verbatim?
MS. BRILL : Yes, Your Honor.
(Crim. No. 12-931 (DRD), D.E. 416 at p. 19).
Furthermore, the Court provided detailed explanations on the right to trial by jury and ensured that Aponte-Aponte understood the rights she was waiving prior to accepting her guilty plea.
THE COURT : Now, the Court is about to read to you, both of you at the same time, a number of rights that you have related to a jury by -- a trial by jury in this case. The Court does so because if the Court, at the end of the plea colloquy, determines to accept your plea, you will be waiving all of these rights. Do you understand that, Ms. Aponte?
MS. APONTE-APONTE : Yes.
THE COURT : And Ms. Berrios?
MS. BERRIOS-COTTO : Yes.
THE COURT : All right. Do you both understand that you have a right to plea not guilty to any offense charged against you and to persist in that plea, that you will then have a right to a trial by jury during which you would also have the right to the assistance of counsel for your defense, the right to see and hear all the witness and have them cross-examined in your defense, the right on your own part to decline to testify unless you voluntarily elected to do so in your own defense, and the right to the issuances of subpoenas or compulsory processes to compel the attendance of witnesses to testify in your own defense? Do you understand those rights, both of you?
MS. BERRIOS-COTTO : Yes.
MS. APONTE-APONTE : Yes.
THE INTERPRETER : Yes as to both.
...
*184 THE COURT : Both of you, do you know that you're entitled to have your case do you know that you're entitled to have your case decided by a jury composed by 12 lay persons selected at random and that the jury would have to agree unanimously before it can return a verdict of guilty, and that the jury will be instructed that you're presumed innocent, and that it could not convict you unless, after hearing all the evidence, it was persuaded of your guilt beyond a reasonable doubt? Both of you, do you understand that?
THE INTERPRETER : Yes as to both.
THE COURT : The jury would also be instructed that you may remain silent, that you do not have to produce any witnesses, and that no reference of guilt could be made by your silence. The jury likewise would be instructed that the burden of proof to prove all the elements of the crime is throughout the trial on the government to prove all the elements of the crime beyond a reasonable doubt. Ms, Aponte, do you understand that?
MS. APONTE-APONTE : Yes.
THE COURT : And Ms. Berrios?
MS. BERRIOS-COTTO : Yes.
THE COURT : Are you aware that the government would be required to present its witnesses and other evidence against each one of you and that you would be able to confront them through your attorneys and have your attorney -- your individual attorneys -- and have your individual attorneys examine them, and that you could present witnesses and other evidence on your behalf and you could even require involuntary witnesses to testify on your behalf through the subpoena power of the Court? Do you understand those rights both of you?
THE INTERPRETER : Yes as to both.
THE COURT : Further, are you aware that as defendants you could rely on the privilege against self-incrimination and therefore decline to testify and no reference of guilt could be drawn from your refusal to testify?
THE INTERPRETER : Yes as to both.
(Crim. No. 12-931 (DRD), D.E. 416 at p. 31-35).
Consequently, since the record does not support Petitioner's allegation that she was not informed of her right to be tried by a jury, the Court finds that Petitioner's claim of ineffective assistance of counsel on this regard is meritless and the same is DENIED.
(4) Counsel was ineffective for failing to challenge the co-defendants' statements .
Petitioner alleges that defense counsel did not challenge "adequately" any of the statements that the co-conspirators offered (D.E. 7 at p. 4). Petitioner provides no further allegations nor arguments as to which statements from her co-defendants she is referring to and/or how these statements prejudiced her. Petitioner's claim of ineffective assistance of counsel in this regard is a generalized allegation that defense counsel failed to challenge the co-defendants' statements that were used in the PSR. There is no indication in the record that the inclusion of co-defendant statements in the PSR prejudiced Petitioner. However, the record does show that at the sentencing hearing, defense counsel stated that Aponte-Aponte had a minor role and that she was the least responsible; the Court agreed (D.E. 417 at p. 11). Consequently, Petitioner's unsupported allegation of deficiency in defense counsel's performance for not challenging co-defendants statements fails to show incompetence and prejudice. Hence, petitioner's request under *185 section 2255 does not comply with the standard of an ineffective assistance of counsel claim. As such, Petitioner's unsupported claim of ineffective assistance of counsel for failure to challenge co-defendants' statements has no merit and the same is DENIED.
(5) Counsel was ineffective for failing to file a notice of appeal and/or an appeal of her conviction.
Petitioner Aponte-Aponte alleges that she received a very lengthy sentence and she requested her attorney "that some type of appeal be filed because she believed that with her 'minimal' role in the offense she should have received less time for the charge (D.E. 1, D.E. 4, D.E. 7).
However, the facts that the defendant accepted as stated in the Government's version of facts at the Plea Agreement (D.E. 345), and the Change of Plea hearing (D.E. 416) reveal that the defendant, although is culpable does not warrant a "minimal" role.
First, the armed carjacking in the instant case was caused by lack of money of defendant Aponte-Aponte to pay her rent (D.E. 345, p.9). Second, the defendant Aponte-Aponte accompanied the other three codefendants to execute the plan of the carjacking. She further gave "the signal to approach the car and execute the plan." Id . Codefendants "Delgado and Osorio entered the car" and began the execution to carjack the victim from "a blue Toyota Matrix." The victim was then taken to an ATM machine where the victim withdrew $ 400, and gave it to Delgado-Ortiz. (D.E. 345, p. 10). The "group then went to a gas station and purchased more gas." Id . They then "drove the [Toyota] Matrix to an old abandoned prison in Guavate," and "parked the car, and everyone got out." Id . "Delgado-Ortiz and Berrios-Cotto escorted Gomez-Saladin [the victim] from the car and told him to kneel." Id . "They doused him with gasoline and lit him on fire." Id . "Gomez-Saladin began yelling and got up and started to run." Id. "He stripped off his pants before tripping on a mound of garbage that was at the scene." Id . "Delgado-Ortiz and Berrios-Cotto followed Gomez-Saladin and began hitting him with sticks and tubing they found in the area." Id . "they beat Gomez-Saladin until he was barely breathing." Id . "The four co-defendants then gathered the sticks and tubing used to beat Gomez-Saladin, placed them in the car, and left the prison in the [Toyota] Matrix." Id . "Delgado-Ortiz then drove to another gas station and they purchased more gasoline in order to burn the Toyota Matrix." Id .... "they then proceed towards La Macanea Road." Id . "There they exited the car and Torres-Osorio poured gas over the seats of the dashboard." Id . "He then set the car on fire." Id . (D.E. 345, p.10).
Hence, the motive of the carjacking was to acquire money for the defendant Aponte-Aponte. The record shows that all the codefendants went to the ATM and forced the victim to give them $ 400. They went together, and two of them lit the Toyota Matrix on fire over the victim. Two of the male codefendants hit the victim with sticks and tubes. As the victim tried to leave, "the four codefendants then gathered the sticks and tubing they found in the area, ... and began hitting the victim." Id.
Finally, "the four codefendants then left the scene on foot." Id . "They also attempted to withdraw more money from Gomez-Saladin's bank account." Id . Hence, defendant Aponte-Aponte's participation cannot be considered as a "minimal role" considering the above recited factual scenario and other considerations. First, the defendant Aponte-Aponte agreed in the plea to *186 a role adjustment of a "minor" participant, hence, "no further adjustments or departures" to the defendant, total offense level shall be sought by "Ms. Aponte-Aponte." (D.E. 345, p.p. 3-4) ... further, "the defendant agreed that she will not seek under any of the factors contained in 18 U.S.C. § 3553, a sentence more lenient than the one detailed in the previous paragraph, as the same is a reasonable sentence." (D.E. 345, p.4). Most critical, the "minimal role" under the USSG § 3B1.2(b) requires "that a defendant must be plainly a peripheral player to justify his/her classification as a minimal participant." United States v. Santos, 357 F.3d 136, 142 (1st Cir.2004). Defendant Aponte-Aponte simply does not comply with the characteristic of a "peripheral player."
Petitioner claims that her defense counsel was ineffective because she did not file a notice of appeal after sentencing even though she requested one (D.E. 1, D.E. 4 at pp.1-2). Petitioner requests an evidentiary hearing as to this matter (D.E. 4 at p. 2).
A prisoner who invokes section 2255 is not entitled to an evidentiary hearing as a matter of right. David v. United States, 134 F.3d 470, 477 (1st Cir. 1998) ; United States v. McGill, 11 F.3d 223, 225 (1st Cir. 1993). "To progress to an evidentiary hearing, a habeas petitioner must do more than proffer gauzy generalities or drop self-serving hints that a constitutional violation lurks in the wings." David v. United States, 134 F.3d 470, 478 (1st Cir. 1998) ; see, Machibroda v. United States, 368 U.S. 487, 495, 82 S.Ct. 510, 7 L.Ed.2d 473 (1962) (holding that a habeas petition is not automatically entitled to a hearing and normally should not receive one if his allegations are "vague, conclusory, or palpable incredible."). Further, evidentiary hearings in section 2255 cases are the exception, not the norm, and there is a heavy burden on the petitioner to demonstrate that an evidentiary hearing is warranted. Moreno-Morales v. United States, 334 F.3d 140 (1st Cir. 2003). An evidentiary hearing "is not necessary when a section 2255 petition is inadequate on its face, or although facially adequate, is conclusively refuted as to the alleged facts by the files and the record of the case. United States v. DiCarlo, 575 F.2d 952, 954 (1st Cir. 1978).
In the instant case, the record does not support Aponte-Aponte's allegation that counsel failed to file a notice of appeal even though she requested it. The record reflects that in the Plea Agreement the parties stipulated a waiver of appeal clause[12] , and that at the change of plea hearing Aponte-Aponte made a knowingly and voluntary waiver of her right to appeal.
THE COURT : Do you understand that you have - I think both of you, let me check that out - you have both signed a waiver of appeal in this particular case, it's Clause No. 17 of the waiver. And it states that both of you, should the Court sentence you, Ms. Aponte, to 293 or below, if the Court sentences Ms. Aponte to 293 or below, you cannot appeal. Do you understand?
MS. APONTE-APONTE : Yes.
(Crim. No. 12-931, D.E. 416 at p. 31).
However, the fact that Aponte-Aponte signed an appeal waiver does not deprive her of all appellate claims. See, Garza v. Idaho, --- U.S. ----, 139 S.Ct. 738, 203 L.Ed.2d 77 (2019) (holding the presumption of prejudice recognized in *187 Roe v. Flores-Ortega, 528 U.S. 470, 120 S.Ct. 1029, 145 L.Ed.2d 985 (2000), applies in cases where a defendant requests counsel file a notice of appeal and counsel refuses to do so, even if there is an appeal waiver). What deprives Aponte-Aponte of her appellate claim is her failure to raise a cognizable issue as to this matter under section 2255. Petitioner has failed to set forth adequate facts or evidence to sustain her allegation that she requested her counsel to file a notice of appeal and her counsel ignored her request. Petitioner does not indicate if she followed up with counsel on this matter nor provided information as to how, and when, she learned that her appeal was never filed. In addition, Petitioner did not submit an affidavit or an unsworn declaration under penalty of perjury, as provided by 28 U.S.C. § 1746[13] , to support her allegation that she told counsel to file an appeal. Because the record does not support Petitioner's alleged instruction to counsel to proceed with an appeal despite her waiver, the Court finds that Petitioner's claim of ineffective assistance of counsel for failure to file a notice of appeal and/or appeal of her conviction is inadequate on its face and thus, the same is DENIED. As such, Petitioner's request for an evidentiary hearing is also DENIED.
III. CONCLUSION
For the reasons stated, the Court concludes that Petitioner Lenisse Aponte-Aponte's Motion and Amended Motion under U.S.C. § 2255 to vacate, set aside, or correct his sentence in Criminal Case No. 12-931(DRD) (D.E. 1 and D.E. 7) is meritless, and is not supported by the record and petitioner's own statements made under oath to the Court. Hence, Ms. Aponte-Aponte's petition filed under 28 U.S.C. Section 2255 must be DISMISSED. Furthermore, Petitioner's request for an evidentiary hearing is DENIED.
IV. CERTIFICATE OF APPEALABILITY
It is further ordered that no certificate of appealability should be issued in the event that Petitioner filed a notice of appeal because there is no substantial showing of the denial of a constitutional right within the meaning of 28 U.S.C. § 2253(c)(2).
IT IS SO ORDERED.

D.E. is an abbreviation of docket entry number.

Aponte-Aponte signed and placed her initials at every page of the Plea Agreement.

Maximum Penalties: "The statutory penalty for the offense charged in COUNT ONE of the Indictment is a term of imprisonment of any number of years up to life, a fine of not more than Two Hundred Fifty Thousand Dollars ($ 250,000.00), and a term of supervised release of not more than five (5) years in addition to any term of incarceration." (Crim. No. 12-931, D.E. 345 at p. 2).

Rule 11(c)(1)(B) Warnings: "The defendant is aware that the defendant's sentence is within the sound discretion of the court, but the same may be imposed following the United States Sentencing Guidelines, Policy statements, Application and Background Notes, as advisory to the imposition of sentence. The defendant is aware that the Court has jurisdiction and authority to impose any sentence within the statutory maximum set for the offense to which the defendant pleads guilty. If the Court should impose a sentence up to the maximum established by statute, the defendant cannot, for that reason alone, withdraw the guilty plea and will remain bound to fulfill all the obligations under the Plea Agreement." (Crim. No. 12-931, D.E. 345 at pp. 2-3).

The number five (5) is repeated twice but with different contents.

Advisory Nature of Sentencing Guidelines: "The defendant is aware that pursuant to the United States Supreme Court decision in United States v. Booker, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), the Sentencing Guidelines are advisory." (Crim. No. 12-931, D.E. 345 at p. 3).

Sentencing Guideline Calculations: "The United States and defendant agree that the following Sentencing Guideline calculations apply to the defendant's conduct with regard to COUNT ONE of the Indictment:" The Sentencing Guideline Calculation Table displays the following information: (a) a base offense level pursuant to U.S.S.G. § 2A1.1 of 43; (b) a two (2) level reduction for being a minor participant pursuant to U.S.S.G. § 3B1.2(b) ; (c) a three (3) level reduction for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1(a) and (b); (d) a total offense level of 38 - assuming a Criminal History Category (CHC) of I (CHCI); (d) range of (235-293); (e) no stipulation as to the CHC (Crim. No. 12-931, D.E. 345 at p. 3).

Specific Sentence Recommendation: "At sentencing, the parties agree to recommend a sentence within the advisory guideline range within paragraph six above." (Crim. No. 12-931, D.E. 345 at p. 3).

Both the Plea Agreement and the Court's colloquy at the Change of Plea hearing, the Court stated to the defendant that she was also facing a potential "life sentence" under the law (D.E. 345, p.2) (Plea Agreement and the Colloquy) "under the law you are both looking at an imprisonment of any number of years and up to life ...." (D.E. 416, p.25, line 25 and p.26, lines 1-2).

The terms of the Plea Agreement and the information provided by the Court to the defendant are in conformity with the Sentencing Guidelines calculations included in Footnote 7 at p. 6, infra, and as the Court explained to Petitioner Aponte-Aponte at the change of plea hearing at p. 7, infra, of this Opinion and Order.

Petitioner's bare allegations are not supported in the record, as established in the Plea Agreement and as to the hearing held relating to the Change of Plea of the defendant.

The defendant hereby agrees that, if this Honorable Court accepts this Plea Agreement and sentence the defendant within the advisory guideline range of 235-293 months, or a more lenient sentence, the defendant then waives and permanently surrenders her right to appeal the judgment and sentence in this case (Crim. No. 12-931, D.E. 345 at p. 6).

28 U.S.C. Section 1746 (2) provides in its relevant part:
Wherever, under any law of the United States or under any rule, regulation, order, or requirement made pursuant to law, any matter is required or permitted to be supported, evidenced, established or proved by the sworn declaration, verification, certificate, statement, oath, or affidavit, in writing of the person making the same (other than a deposition, or an oath of office, or an oath required to be taken before a specified official other than a notary public), such matter, with like force and effect, be supported, evidenced, established, or proved by the unsworn declaration, certificate, verification, or statement, in writing of such person which is subscribed by him, as true under penalty of perjury, and dated, in substantially the following form:
...
(2) If executed within the United States, its territories possessions, or commonwealths:" I declare (or certify, verify, or state) under penalty of perjury that the forgoing is true and correct. Executed on (date). (Signature)".